Anthony J. **CELEBREZZE**, Secretary of
Health, Education and Welfare,
Appellant,

v.

Herbert E. **BOLAS**, Appellee.

No. 17176.

United States Court of Appeals
Eighth Circuit.

April 29, 1963.

Terence N. Doyle, Atty., Dept. of Justice, Washington, D. C., for appellant; Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Washington, D. C., Theodore L. Richling, U. S. Atty., Omaha, Neb., Alan S. Rosenthal and Harvey M. Goldberg, Attys., Dept. of Justice, Washington, D. C., on the brief.

Samuel V. Cooper, Omaha, Neb., for appellee; Jack W. Marer, Omaha, Neb., with him on the brief.

Before SANBORN and BLACKMUN, Circuit Judges, and STEPHENSON, District Judge.

BLACKMUN, Circuit Judge.

Herbert E. Bolas, pursuant to § 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), instituted this action for review of the Secretary's final decision disallowing Bolas' claim for a period of disability under § 216(i), as amended, of the Act, 42 U.S.C.A. § 416(i). The district court granted the claimant's motion for summary judgment and thereby reversed the Secretary's decision. The Secretary has appealed.

Bolas filed his application to establish a period of disability on July 20, 1955. In this he stated that he was born in 1899; that he became unable to engage

in substantial work on April 23, 1953; that he had been employed by Metropolitan Life Insurance Company from 1928 to April 1953 as a "Trained Insurance Salesman, Collecting premiums and Selling insurance"; that he was receiving disability benefits from the Metropolitan; that he had had ten medical examinations since disability began; that, as to his daily activities, he "Can Walk, Can drive Car, Has dizzy spells and does very little around house"; that his illness prevented him from working because he "Can't sit up long, or stay up very long"; that he did not wish a referral to vocational rehabilitation; that his earnings, since April 23, 1953, were renewals; that "I have done no work since that date"; and that the nature of his illness was arthritis of the spine which rendered him "unable to remain out of bed except for short periods of time" and "unable to remain standing or sitting for long periods".

Prolonged but obviously careful and considerate administrative action followed. The Bureau of Old Age & Survivors Insurance first disallowed Bolas' claim on the ground that "your impairment has not been severe enough to prevent you from doing some kind of gainful work". Upon reconsideration the claim was again disallowed. At Bolas' request a field hearing took place in Omaha in August 1957. The referee held that Bolas was not entitled to the disability period. The Appeals Council denied review. Attorneys were then retained and this court action was instituted. The matter was remanded pursuant to § 205(g) for further administrative action. The Council vacated its denial of review. Evidence from the files of the Metropolitan was obtained. A supplemental hearing was held in Omaha. The Appeals Council determined that still further medical evidence was necessary. Bolas was examined at government expense by three physicians who submitted written reports. Again the matter was referred to the referee so that oral testimony could be elicited from the physicians.

Finally the Appeals Council on September 9, 1960, issued a lengthy and comprehensive decision. It reached the following conclusion:

"The Appeals Council agrees that the claimant has certain impairments similar to those of other persons his age that are the result of the natural aging process, no more and no less, but finds that such impairments either singly or in combination, are not of the type that preclude him either from engaging in his usual work or from engaging in *any* kind of substantial gainful activity."

This reference is obviously directed to the definition of "disability" in § 216(i)(1), as amended, 42 U.S.C.A. § 416(i)(1):

"[T]he term 'disability' means * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration * * *."

It is this ruling of the Appeals Council which was the "final decision of the Secretary", Cody v. Ribicoff, 8 Cir., 1961, 289 F.2d 394, 395, which was reversed by the district court and which now reaches us on appeal almost eight years and four Secretaries after the claimant's application was filed.

Both sides stress the applicable legal standards. There is no real dispute as to these:

■ 1. Bolas, technically, has the burden of establishing his claim. Kerner v. Flemming, 2 Cir., 1960, 283 F.2d 916, 921; Poage v. Ribicoff, E.D.Mo., 1962, 205 F.Supp. 938, 939; Blanscet v. Ribicoff, W.D.Ark., 1962, 201 F.Supp. 257, 260.

■ 2. The Act is remedial and is to be construed liberally. Kohrs v. Flemming, 8 Cir., 1959, 272 F.2d 731, 736.

■ 3. The Secretary's findings of fact and the reasonable inferences drawn

from them are conclusive if they are supported by substantial evidence. The statute, § 205(g), 42 U.S.C.A. § 405(g), is specific. This is the limitation of judicial review of the Secretary's decision. Hoffman v. Ribicoff, 8 Cir., 1962, 305 F.2d 1, 6; Cody v. Ribicoff, supra, p. 395 of 289 F.2d.

■ 4. "Substantial evidence is more than a mere scintilla * * *." It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456.

■ 5. It has been said that our posture in reviewing this appeal from the district court is not limited to a mere determination of whether that court misapprehended or misapplied the substantial evidence test (as the Supreme Court, in Universal Camera, p. 491 of 340 U.S., p. 466 of 71 S.Ct., 95 L.Ed. 456, places itself when considering a court of appeals' review of agency findings) but is, instead, no different than that of the district court in reviewing the Secretary's findings. Edgerly v. Ribicoff, 5 Cir., 1962, 311 F.2d 645, 646; Ward v. Celebrezze, 5 Cir., 1962, 311 F.2d 115, 116; Roberson v. Ribicoff, 6 Cir., 1962, 299 F.2d 761, 763.

■ 6. The determination of the presence of substantial evidence is to be made on a case-to-case basis. Celebrezze v. Wifstad, 8 Cir., 1963, 314 F.2d 208, 210; Hoffman v. Ribicoff, supra, p. 9 of 305 F.2d.

■ 7. "Where the evidence was in conflict, or subject to conflicting inferences, it is for the Appeals Council on behalf of the Secretary to resolve such conflicts." Gotshaw v. Ribicoff, 4 Cir., 1962, 307 F.2d 840, 845; Snyder v. Ribicoff, 4 Cir., 1962, 307 F.2d 518, 520; Tircuit v. Ribicoff, S.D.Tex., 1961, 199 F.Supp. 13, 15.

■ 8. The statutory definition of disability imposes the three-fold requirement (a) that there be a "medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration"; (b) that there be an "inability to engage in any substantial gainful activity"; and (c) that the inability be "by reason of" the impairment. Pollak v. Ribicoff, 2 Cir., 1962, 300 F.2d 674, 677.

■ 9. "Substantial gainful activity" has been described:

"The activity in which a disabled claimant can be found to be able to engage must be both substantial and gainful and within his capacity and capability, realistically judged by his education, training and experience." Ribicoff v. Hughes, 8 Cir., 1961, 295 F.2d 833, 837.

"Such a determination requires resolution of two issues—what can applicant do, and what employment opportunities are there for a man who can do only what applicant can do? Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available." Kerner v. Flemming, supra, p. 921 of 283 F.2d.

10. The emphasis is directed not to the average man but to the particular claimant's capabilities. Ellerman v. Flemming, W.D.Mo., 1960, 188 F.Supp. 521, 526.

■ 11. The word "any" in the statute "must be read in the light of what is reasonably possible, not of what is conceivable." Klimaszewski v. Flemming, E.D.Pa., 1959, 176 F.Supp. 927, 932; Kohrs v. Flemming, supra, p. 736 of 272 F.2d. See also Jarvis v. Ribicoff, 6 Cir., 1963, 312 F.2d 707, and Hodgson v. Celebrezze, 3 Cir., 1963, 312 F.2d 260.

■ The claimant argues that, although the district court noted there was some evidence opposing his position, this evidence is not substantial; that he was a steady, ambitious and successful life

insurance employee; that insurance companies do not give money away; that his disability status with the Metropolitan was effected before the passage of the social security freeze provisions and thus forecast a consequent disadvantage under the Act; that the Metropolitan's acceptance of his disability status is highly significant, citing Jacobson v. Folsom, S.D.N.Y., 1957, 158 F.Supp. 281, 287, because that insurer's standards are as strict as those of the Act; that the family doctor is the one who best knows the patient; that the three specialists supplied by the government proffered only opinion evidence and did so under circumstances where their testimony was expected to be unfavorable; that they saw the claimant for only a short time; that the Secretary concedes that the claimant has pain; that its presence, in any event, cannot be disproved; and that there is no employer who would hire him.

This takes us to a consideration of the evidence. We usually refrain from making a detailed review of the evidence in cases which are primarily factual. We do so here, however, because of the increasing incidence of this type of case, because this claimant insists that the opposing testimony is not substantial, and because the district court concluded that the decision of the Appeals Council must be reversed.

Bolas testified that he was born in 1899 in England; that he there had the equivalent of a high school education; that he came to the United States and to Omaha at age 21; that he first engaged in heavy construction work for about four years; that he obtained an "engineer's license"; that because of the scarcity of construction work in the winter he obtained employment for about a year and a half with a laundry and did pickup and delivery work; that he then joined his brother in the dairy business for about 18 months and did loading and some route work; that all this was heavy work; that he was in good health through those periods; that he went to work for the Metropolitan in May 1928; that he satisfactorily passed that company's preemployment physical examination; that he engaged in collection and sales work both during the day and at night for 18 months in a designated city territory; that this required him to be on his feet all day long; that he became an assistant manager in October 1929 and had 8 or 9 men working under him collecting premiums and selling insurance; that he worked with these men and was on his feet; that this continued and his health remained good until 1936; that he then had prostate trouble, underwent surgery, and was off for about six weeks; that he returned and worked steadily until 1938 when he had further surgery for the same problem; that he was off a month and again returned; that he had an appendectomy but encountered difficulty because of infection and was off 2 months; that "that kind of took the starch out of me * * * and I didn't have the physical stamina for [my assistant manager's work]"; that he had pain on riding over the rough territory; that he asked the Metropolitan to demote him to a district office; that this was done at the beginning of 1944 and he was able to work inside; that he continued to solicit in the evenings; that he actually earned more as a district office agent than as an assistant manager; that he had surgery for varicose veins; that he stayed on this work until he was disabled in February 1953; that he consulted Dr. Willis D. Wright in February 1953 and complained of pain from the rectum through the lower back; that he was placed in a hospital for a checkup and was there 11 days; that he was told he had arthritis of the spine, his bone structure was deteriorating, he could not work, and should not do anything; that he nevertheless returned to work for 4 or 5 weeks; that the pain was active, continuous and extreme; that he could not sleep "so I just quit"; that the company automatically put him on temporary disability; that he was examined by company doctors; that the Metropolitan paid him disability benefits under policies he possessed with that company; that he has sustained no improvement since

1953; that "I don't know what kind of work I could do if I couldn't sell life insurance"; that "for me to sit a long time in one place, it just kind of beats me. I just can't do it. I can't go to church, and I can't go to ball games, I just can't do it"; that his entire day is devoted to resting and watching television; that since 1953 he has done no work around the house; that he sold his home because he could not take care of it and was buying an apartment house; that he lives on the second floor; that since 1953 he has had constant and continuous back pain and has had no single day free of pain; that about half the time he is awakened at night because of the pain; that "I am easier in my car than any other place"; that he has ridden to Arizona where his daughter attended school; that he did some of the driving on these trips but "was resting in the back seat most of the time, lying down"; that Dr. Wright told him to get away in the winter; that he had gone to Tucson for about 90 days after Christmas; that he received diet instructions from Dr. Wright because x-rays showed he had gallstones; that he has had to give up all active social life; that 3 times a year Dr. Wright has examined him for the Metropolitan; and that he has been told his condition would continue indefinitely and probably for the rest of his life.

Mrs. Bolas in general corroborated this testimony. She also stated that her husband was not one who complained and that she herself had had surgery for a disc and gallbladder.

Dr. Wright, an Omaha internist, testified that he was first consulted by Bolas in June 1946 because of acute pyelonephritis; that he saw him later for appendicitis and varicose veins; that in February 1953 Bolas complained of low back and abdominal pain; that upon hospitalization the diagnosis was "arthritis, chronic of the right hip, and a generalized osteoporosis was established"; that "osteoporosis is a situation that we all develop as we mature, but it doesn't start until we are probably 65 or 70; I mean in men; it starts earlier in women; and it is a situation that we just don't quite replace the amount of calcium in the bones as it is discharged * * * it becomes a process that is rather painful * * * Once the bone is osteoporotic there is so little can be done * * * in Mr. Bolas, it is occurring at the pelvis and at the vertebra of the back"; that the arthritis was not related to the osteoporosis; that Bolas was suffering the pain of both; that in April 1954 "we felt that he was in a situation that he was permanently disabled as far as carrying on any sustained activity"; that he advised Bolas not to work; that he is in constant pain; that "he was totally and permanently disabled when I saw him on * * * April 12th, 1954 * * * It has continued that way"; that his condition "is of serious proportions which is expected to be of long-continued and indefinite duration * * He is unable to go on any type of gainful work simply because he cannot go into any sustained activity * * * He could not take on any type of work that I know of, and he can't be rehabilitated * * the condition from which he is suffering produces the kind of pain about which he has complained * * * He has not responded to what is accepted as anti-rheumatic remedies * * * this condition * * * is progressive in its nature and character and will gradually affect other portions of his spine * * * And the fact that he might look robust has no relationship to the fact that he is in constant pain"; that he advised the Metropolitan Bolas was totally and permanently disabled; that he told him to go to a warmer climate in the winter; that pain "is a subjective situation. Anybody that sees individuals with rheumatism knows that the findings radiologically and on physical examination cannot be correlated with the subjective symptoms or the degree of disability. We see people with very minimal changes; they have considerable pain. You see people with very marked rheumatic changes that have no discomfort. Now, there is no explanation for that. In this situation he has radiological evidence of dis-

ease, and he has symptoms, and the radiological findings are factual; the symptoms are subjective. We have to accept what he tells us * * * But here, when he says he has constant pain, we have radiological evidence that he has a cause for this pain, and that is the way it has to be"; that he had every reason to believe Bolas was telling the truth; that "He has never presented any functional problem"; and that he was not a patient who called every time he had a little ache.

Dr. Shaun D. Gunderson was the radiologist brought into the case at government expense. He testified that at the request of Dr. Stanley M. Bach roentgenograms of Bolas' dorsal and lumbosacral spine and pelvis were taken in April 1959; that he compared these with hospital films taken in 1946, 1953, and 1956; that the 1946 films disclose that "he does have a relative degree of osteoporosis, and he does have some early degenerative osteoarthritic change within the lumbar spine and likewise within both hip joints. This has not changed to any significant degree, radiographically, during the interval from 1946 to 1959"; that osteoarthritis "is no more than bony spurs that build up as a reaction to the normal wear and tear merely existing in living. Everybody eventually will develop degenerative osteoarthritis in their spine if they live long enough * * * Osteoporosis is no more than demineralization of bone * * * It is the actual absorption of calcium from the bone structure * * * [It] is most evident in vertebra and in the bony pelvis in the greatest majority of cases * * * In this case we saw it in the spine and in the pelvis * * * the osteoporosis existed in '53 and in '56 * * * osteoporosis, as such, does not produce symptoms. Osteoporosis, as a diagnosis, is not a disabling disorder * * * It is the end result of osteoporosis that produces symptoms"; that there is no pain attached to it "until you have secondary involvement * * * I can't tell pain from an X-ray * * * The patient says he has pain; I can't disprove pain,

nor can anybody * * * The fact that he exhibits and has exhibited osteoporosis of a mild to moderate degree since 1946 with no significant interval change in this period of time, to me, means that this is non-progressive * * *"; that osteoporosis which "is stable and of long-standing usually is not a severe symptomatic situation; and certainly in my clinical experience I have never known it to create disability".

Dr. Henry J. Lehnhoff, Jr., was the internist who examined Bolas at Government expense on May 5, 1959. He testified that, unknown to the claimant or his doctor, Bolas had diabetes mellitus; that he also had cholelithiasis, renallithiasis, varicose veins of little significance, osteoarthritis of moderate degree involving the 4th and 5th lumbar vertebrae and the 1st sacral segment, and osteoporosis; that "all of these are of long duration, but none of them are disabling"; that osteoarthritis and osteoporosis "aren't always painful. They may produce variable degrees of pain"; that he disagreed with Dr. Wright's testimony that Bolas "was permanently disabled as far as carrying on any sustained activity"; that he also disagreed when Dr. Wright stated that he "was suffering from a condition which would totally and permanently disable him from engaging in any occupation"; that "According to my findings of Mr. Bolas' condition, I don't think he is disabled"; that he did not think his condition "prevents him from engaging in any substantial gainful activity"; that he disagreed when Dr. Wright stated that "his condition is one of serious proportions"; that he disagreed when Dr. Wright stated "He is unable to go on any type of gainful work simply because he cannot go into any sustained activity"; that he disagreed when Dr. Wright stated that "he cannot work for any long period of time"; that "I can't prove the presence or the degree of pain"; that "most patients I have seen who have the degree of osteoporosis and osteoarthritis he has can do those things"; that "I don't think he is disabled to the point where he can't carry on

a gainful occupation"; that he might say that he did not think his pain was as severe as the patient says it is; that pain cannot be measured by either objective physical or X-ray findings; that one of the best remedies for osteoporosis is use; that "We urge these people to use their osteoporotic extremities and bones and it will improve. We hate to put them to bed and have them rest if we know how to treat them  *  *  *  It is not as severe as Dr. Wright's testimony indicates it is".

Dr. Stanley M. Bach was the orthopedist who gave Bolas an orthopedic examination at government expense in April 1959. He testified that Bolas had degenerative disc disease involving the 5th lumbar space and evidence of early osteoarthritic changes in the right hip joint; that there was no evidence "of senile osteoporosis or generalized arthritis. The orthopaedic problem presented is compatible with light or sedentary work"; that osteoporosis in his experience is not usually accompanied by pain; that degenerative disc disease will cause pain; that "I think there are things that Mr. Bolas could do that would be substantially gainful"; that "what discomfort means to Mr. Bolas and what it means to me are not necessarily the same. I have to accept his statement on that"; that people with the ailments Bolas has have pain; that he had seen many people with those ailments work; that "It depends a great deal on whether he wants to or not"; that "pain is not necessarily bad. We are all familiar with what happens when we go out and play football the first time in the Fall  *  *  *  harm and pain are not necessarily synonymous"; and that pain might result if Bolas "engages in activity such as walking or standing for any appreciable length of time".

There is other evidence, largely documentary in nature, all of which need not be reviewed here. It does include, however, written reports from the same physicians and a letter dated November 14, 1956, from Dr. Louis S. Campbell, an orthopedist of Omaha, who had examined Mr. Bolas in March 1953 and again in October 1956. In this letter he stated:

"In summary I would say that from a subjective standpoint activity aggravates his back complaints, even though this activity may be minimal. *  *  *

"It is my impression that this man's diagnosis is that of moderate obesity; lumbosacral instability on the basis of degenerative inter-vertebral disc disease, but without nerve root pressure signs or symptoms; osteoarthritic changes secondary to wear and tear, involving the lumbar and lumbo-sacral spine and the right acetabulum. I might also add that the recent x-rays, when compared with films previously taken in 1953, show only minimal progression of the various above-described bone and joint changes."

Also included are the files of the Metropolitan pertaining to Mr. Bolas. These disclose that under a personal insurance policy with that company disability payments were eventually allowed in April 1954, retroactive to February 4, 1953, and the waiver of premium provision of the contract was activated, and that Bolas was granted total and permanent disability benefits under the company's group insurance policy covering their agents in the United States.

Upon this evidence the Appeals Council reached the conclusion quoted above. The district court, however, gave emphasis to the varying physical difficulties encountered by Bolas during the period of his Metropolitan employment. It laid particular stress on his osteoporosis and his osteoarthritis, on the payment of benefits by the Metropolitan, and on the testimony of Dr. Wright and of Bolas himself. It noted that "there is clear evidence that there is physical impairment" and it referred to the subjective character of pain. It observed:

"Three of the witnesses who gave some testimony which would be considered adverse to the claimant's

case, Dr. Gunderson, Dr. Lehnhoff, and Dr. Bach, all agreed that pain is a subjective thing. Dr. Lehnhoff and Bach each examined Mr. Bolas in 1959; Dr. Gunderson interpreted x-ray films of Mr. Bolas. The testimony of these three men is in the nature of opinion evidence, and their opportunity to observe and to evaluate his condition was of very short and limited duration. Their opinion, while valuable and entirely worthy of credence must necessarily be evaluated in the light of their limited opportunity to observe the claimant and the objective indications of his condition."

The testimony of Dr. Wright and of Mr. and Mrs. Bolas of course would constitute substantial evidence to justify a finding of disability. But this is not determinative. There was positive opposing evidence. Certainly Dr. Gunderson's testimony that the x-rays over the years all show osteoporosis and early degenerative osteoarthritic change; that, however, they show no change of any significant degree during the nine year interval; that osteoarthritis is a part of the aging process; that osteoporosis is not in itself disabling; that the claimant's osteoporosis is non-progressive; and that this type in his experience has never produced disability, is such opposing evidence. Certainly Dr. Lehnhoff's testimony that none of Bolas' diseases was disabling; that he disagreed with Dr. Wright when the latter said (a) that Bolas was permanently disabled, (b) that he was suffering from a condition which would disable him from engaging in any occupation, (c) that Bolas' condition was of serious proportions, (d) that he was "unable to go on any type of gainful work simply because he cannot go into any sustained activity", (e) that Bolas cannot work for any long period of time, and (f) that Bolas cannot carry on a gainful occupation; that Bolas was not disabled; that similar patients can do the things Bolas says he cannot do; and that Bolas' pain is not so severe as Dr. Wright indicated, is such opposing evidence. Certainly Dr. Bach's testimony flatly to the effect that Bolas' orthopedic problem is compatible with light or sedentary work and that much depends on whether the patient wants to work, is similarly opposing.

There are some additional factors, too, which may be regarded as of weight for the trier of fact: Bolas in his application refused vocational rehabilitation. See Pearman v. Ribicoff, 4 Cir., 1962, 307 F.2d 573, 574, cert. denied Pearman v. Celebrezze, 371 U.S. 951, 83 S.Ct. 507, 9 L.Ed.2d 500. All the surgery he underwent took place before the date of his claimed disability. His diabetes became known only in 1959 through Dr. Lehnhoff. Neither it nor the surgery contributed significantly to disablement centering in the osteoarthritis. The Secretary does not deny that Bolas had and does have some pain. Because pain is subjective it is a most difficult factor to weigh in evaluating disability. And it is not necessarily ignored in the formulation of an administrative decision. Compare Butler v. Folsom, W.D.Ark., 1958, 167 F.Supp. 684, 689.

To summarize: the evidence, particularly the testimony of the four physicians, clearly created the not unusual situation of opposing and conflicting medical testimony as to the claimant's disability. There is thus substantial evidence each way and it is such as would justify whichever finding and conclusion the trier of fact made. The resolution of this conflict is what the trier of fact is for. Had this case been one tried to a jury it is obvious to us that Bolas would not have been entitled to a directed verdict and that the jury's verdict either way would have been conclusive. Consequently, the Secretary's decision here, if it be wrong, is an error of fact and is not subject to correction by a reviewing court. Robinson v. Railroad Retirement Bd., 8 Cir., 1950, 184 F.2d 703, 705. We must not allow ourselves to regard an administrative agency charged with fact finding duties "to act as a sort of special master for this Court, to report testimony, to make advisory findings, and to

enter an advisory judgment." Pender-grass v. New York Life Ins. Co., 8 Cir., 1950, 181 F.2d 136, 138.

We regard the fact situations presented in Kohrs v. Flemming, supra, 272 F.2d 731, in Ribicoff v. Hughes, supra, 295 F.2d 833, and in Lewis v. Flemming, E.D.Ark., 1959, 176 F.Supp. 872, as clearly distinguishable from those present here. Those were cases of definitely ascertainable and recognizable bodily disability with objective medical findings of substance and of recognized pathology. In Kohrs the claimant had a sadly crippled arm; she had visited the rehabilitation center; and there was no testimony creating a conflict in medical evidence. In Hughes the Secretary conceded existing disability; the basic questions were those of rehabilitation by surgery and of employment within that claimant's capacities. In Lewis there was no real conflict in the testimony of the plaintiff and that of the physicians.

■ We are not persuaded by the suggestion that the record fails to disclose what this claimant could do by way of gainful employment. More than one physician testified that his condition was compatible with light work and work of a sedentary or semi-sedentary character. This is not a situation where this kind of activity would be new and untried for Bolas and beyond his capacities, training and experience. Compare Randall v. Flemming, W.D.Mich., 1961, 192 F.Supp. 111, 123, 128, and Lewis v. Flemming, supra. His work with the Metropolitan as a district agent fits this classification. He was not unfamiliar with office work. It has been said, Ellerman v. Flemming, supra, p. 527 of 188 F.Supp.:

"[I]t is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. * * * If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type of work; actually, not apparently."

But we conclude that any such burden which might be said to be upon the defendant here has been met. It is not the duty or the burden of the Secretary to find a specific employer and a specific job for the claimant. Some effort and some ingenuity, albeit within the range of his capacity, remains for him to exercise.

Reversed with directions to enter judgment for the Secretary.