Jesse M. LESTER, Plaintiff,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 934.

United States District Court
S. D. West Virginia,
Bluefield Division.

Aug. 8, 1966.

Warren R. McGraw, Pineville, W. Va., for plaintiff.

Milton J. Ferguson, U. S. Atty., and George D. Beter, Asst. U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. A decision rendered by a hearing examiner on November 29, 1965 became the final decision of the Secretary on February 2, 1966, when the Appeals Council denied plaintiff's request for review. The final decision holds that plaintiff failed to establish that he was disabled within the meaning of the Social Security Act before June 30, 1958, when he last met the earnings requirements, and that he failed to establish that he is entitled to a period of disability or to disability insurance benefits under the provisions of the Act prior or subsequent to the 1965 Amendments.

■ Plaintiff last met the earnings requirements of 42 U.S.C.A. §§ 416(i) (3) and 423(c) as of June 30, 1958. Thus, under the Act, 42 U.S.C.A. § 416 (i) (1), an individual shall not be considered to be under a disability unless he *furnishes such proof of the existence thereof* as may be required. The burden is upon the plaintiff to establish by credible evidence that he was disabled within the meaning of the Act as of June 30, 1958, though it need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir.1964). We agree with the Secretary's finding that plaintiff has failed to carry this burden.

■ The standard of review in actions of this nature is found in Section 205(g) of the Social Security Act, as amended, and is as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * * ."

In short, the Courts are not to try the case *de novo*, and if the findings of the

Secretary are supported by substantial evidence, the Courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir.1962). Nevertheless it is said that this provision of the law does not contemplate that the Courts should surrender their "traditional function," but instead that they will view the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the finding is supported by substantial evidence and to see to it that the Administrative Agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir.1962). In determining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. Thus the immediate task of this Court is to determine whether the defendant's denial of the plaintiff's claim is supported by substantial evidence.

The plaintiff originally filed an application for benefits July 12, 1961, alleging that he became unable to work in 1959 because of nerves and stomach trouble. This claim was finally disallowed by the action of the Appeals Council on June 6, 1963, in refusing to review the decision of the hearing examiner. No court review was requested of that decision. Plaintiff filed his present claim for benefits February 16, 1965, stating that he became unable to work as of March 19, 1958 because of "stomach ulcers, nervous, arthritis and blackout spells."

Plaintiff was born May 1, 1927, at Twin-Branch, West Virginia, and has a sixth grade education. He is married

and the father of four children; the eldest having been born February 3, 1959. Since 1960, he has been receiving welfare payments from the State of West Virginia, based upon the Aid to Dependent Children program. He has also stated that he was on welfare for a period of six or eight months in 1951 due to ill health.

Plaintiff's last employment was with a boat manufacturer in Baltimore, Maryland, as a paint stainer. He was laid off from this position in February of 1958 as a result of a general lay off. Prior to acquiring this job, in September of 1957, he had worked sporadically for the past ten or eleven years as a coal miner in West Virginia. With the exception of having worked as a laborer for approximately a year at a steel plant in Detroit, Michigan, when he was about seventeen years of age, and two short periods immediately prior and subsequent to this job when he worked in the timber industry, his work has been as a coal loader in the mines.

Plaintiff states that though he was notified to return to work in Baltimore in the spring of 1958, he was too ill to do so. He also testified that he has tried to obtain work in the mines since that time but that he has been told by the supervisors that he is not strong enough or heavy enough for mine work. Both plaintiff's wife and a neighbor have testified that plaintiff has been unable to work since 1958 and the record shows that he has not worked since February of 1958.

Plaintiff's earnings for the first quarter of 1958 were $461.25 and for the year 1957 were $1,071.79. The only other year in which he earned in excess of $1,000.00 was in 1951 when he earned $1,748.14.

The instant case is complicated by the fact that Dr. H. M. Coleman, who treated plaintiff on March 19, 1958, and who both plaintiff and his wife testify advised him he had back trouble, nervousness, and stomach ulcers and that he was unable to work, is now deceased and a statement concerning this visit is not

available, other than a note signed by Mrs. Don Coleman to the effect that "Dr. H. M. Coleman's records show that Mr. Jessie M. Lester was in for a check up on March 19, 1958."

The problem then becomes whether or not plaintiff's subsequent medical history as well as the other evidence in this record is sufficient to sustain the Secretary's determination that plaintiff was not disabled as of June 30, 1958 within the meaning of the Act, 42 U.S.C.A. § 423(c) (2), which defines disability as,

"[I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months * * *."

A summary of the medical evidence in the present case subsequent to the visit to Dr. Coleman is as follows: A report of Dr. T. C. Clark of Iaeger, W. Va., dated January 14, 1960, in which plaintiff complained of weakness, nervous stomach, pain in the stomach and occasional vomiting. The report indicated that plaintiff had previously been treated at Clark's Clinic for a nervous stomach. Dr. Clark found plaintiff to be underweight and small in stature and that he was apprehensive and nervous. The diagnosis was that he was undernourished, underweight and had physical inertia or occlusion of normal labor. Dr. Clark recommended a stomach X-ray and that plaintiff be given job training and placement. He also felt that plaintiff was able to perform work in keeping with his physique.

The next medical evidence, chronologically, is the report of Dr. Malcolm G. MacAulay, a full-time specialist in psychiatry at the Beckley Mental Health Center. The report is dated May 23, 1960, and makes no objective findings. The diagnosis is that plaintiff has an inadequate personality, with chronic psychoneurotic overlay. Dr. MacAulay states that inadequate personality is not actually classified as a mental illness but that he did not believe it likely that plaintiff would go back to work.

Dr. Edward D. Gibson, Iaeger, West Virginia, in a report dated July 13, 1961, states that plaintiff's present illness had its onset in 1959 and that he became unable to work in 1959. It also indicates that there had been a previous history of the illness and that plaintiff's first visit was in 1947, with about monthly visits since that time. The symptoms reported were vomiting, inability to eat, blackout spells and great fear. The only objective findings are height of 67 inches and weight of 111 pounds.

The diagnosis was severe anxiety state and gastric ulcers. The treatment was said to have been the usual with no response with the condition being listed as progressive. Dr. Gibson concluded that the plaintiff was in need of hospitalized psychiatric treatment and that he was presently unable to work, but that he might be reclaimed by proper psychiatric care.

A statement signed by Dr. N. F. Coulon follows, to the effect that plaintiff was seen at the Clark Clinic on January 24, 1962 for nervous indigestion.

The next medical report is that of Dr. John M. Mimms, Iaeger, West Virginia, dated March 24, 1962, which states that the illness occurred in February 1958, and that plaintiff became unable to work in 1958. The development of sharp pains in the stomach, weakness and nervousness are listed with regard to previous history of the illness. The report indicates that Dr. Mimms first observed plaintiff the previous day and lists the following objective findings: Blood pressure 90/70, weak and asthenic build and sharp pain in epigastrium on palpation. The diagnosis was (1) acute duodenal ulcer, (2) chronic anxiety tension state, and (3) malnutrition. Under treatment the report listed vitamin tonic and poor response. Dr. Mimms listed the condition as static and concluded that the patient's physical condition was such that he was too weak and nervous to do any type of work.

Dr. K. N. Byrne signed an X-ray report, dated January 23, 1963, which found increased rugal markings in the stomach, slightly irregular duodenal cap and moderate lipping of the dorsal and lumbar spine. The impressions were: (1) Gastritis, (2) duodenal ulcer, (3) degenerative joint disease of the spine.

All of the foregoing medical evidence was submitted in support of the original claim. The medical evidence submitted with the present application is as follows:

A report of Dr. Kenneth N. Byrne, dated December 28, 1962, a good portion of which is illegible due to the copying process, states that plaintiff was 5 ft. 7 in. in height, weighed 120 lbs., was fair in his general appearance with blood pressure of 120/80. His heart size was described as normal and regular in sound. There was no abnormality or injury of a mental or nervous nature to the nervous system listed, although the diagnosis included nervous anxiety as well as stomach ulcer. Dr. Byrne concluded that the plaintiff should perform no full-time work and only part-time minimal work and that he should be put on a regular regimen for treatment of the ulcer condition.

The next report is that of Dr. O. Lake Huffman, dated December 17, 1963. It lists weight at 120 lbs., posture good, gait normal and general appearance as tall, thin and emaciated looking. Blood pressure was 144/82, pulse was 100 and regular with heart size and sound being described as normal. The diagnosis was that plaintiff was suffering from a duodenal ulcer and anxiety reaction. Dr. Huffman concluded that the prognosis was not good due to plaintiff's mental attitude and that at present he was unable to engage in full or part time work, but that if he could be taught leather craft which he could do at home, he might be able to engage in that type of work.

Dr. E. M. Wilkinson, Pineville, West Virginia, in a report dated May 13, 1964, diagnosed plaintiff to be suffering from a peptic ulcer, arthritis, more pronounced in the spine, and Parkinson's disease.

Plaintiff places considerable reliance upon this report to support his position that he was disabled in June of 1958. His general appearance is described as being somewhat pale and emaciated looking with normal posture and gait. His weight was 120 lbs., blood pressure 100/54 with pulse regular and heart size and sounds being normal. The report also described a marked tremor of the hands at times. The prognosis was that the ulcer should improve with diet and drugs, but that it was more uncertain as to the arthritis and the paralysis agitans. It does not appear, as the hearing examiner concluded, that Dr. Wilkinson's report found the diagnosis of Parkinson's disease questionable but rather that it was the prognosis regarding it. It was Dr. Wilkinson's opinion that plaintiff was not strong enough to do gainful work and that he was too nervous and tense to do part-time work.

The most recent report is that of Dr. Gene W. Harlow, Pineville, West Virginia, dated May 25, 1965, which lists plaintiff's general appearance as well nourished, weight 126 pounds, posture good and gait good. Blood pressure was 144/80, pulse regular and heart normal. It was noted that plaintiff had a tremor of the upper extremity with no loss of motion or nerve function. Dr. Harlow's diagnosis included peptic ulcer, chronic anxiety and osteoarthritis. It was his opinion that the patient's chronic anxiety was his chief problem and that the physical illness was not a limiting factor. He also felt that plaintiff was able to do work consistent with his training and skills.

On November 11, 1965, Dr. Wilkinson signed a statement to the effect that he had been treating Jesse M. Lester for more than a year and that in his opinion he was permanently disabled with arthritis and other chronic ailments.

Plaintiff has also introduced, in support of his claim of disability, certain letters from the West Virginia Rehabilitation Division of the State Board of Vocational Education. The last of these, dated February 17, 1961, and signed by

Cecil E. Lacy, counselor, states that he does not believe that there is any service through the vocational rehabilitation program that could put plaintiff to work.

From the evidence the ailments which separately or in combination could have caused plaintiff to be disabled as of June 30, 1958, are as follows:

1. Arthritis
2. Ulcers
3. Nerves or mental disability
4. Parkinson's disease

There is little question but that plaintiff is currently suffering from arthritis; however, in his application for benefits, dated February 16, 1965, he states that he has been suffering from arthritis for the past two years and in his request for reconsideration, dated September 2, 1965, he again states that the arthritis started in the first part of 1963.

██ It is clear that an impairment that has come into existence after the expiration of the eligibility date and which may have subsequently combined with other impairments to presently produce the required disability cannot be considered. Parker v. Ribicoff, D. C., 205 F.Supp. 310 (1962).

Admittedly, arthritis is progressive and may exist for a time prior to its outwardly manifesting itself. However, the record in this case first refers to an arthritic condition as moderate lipping of the dorsal and lumbar spine in the X-ray report of January 23, 1963, which Dr. Byrne diagnosed to be degenerative joint disease of the spine. The record is almost devoid of evidence to support a finding that this arthritic condition alone or in conjunction with any other ailment was a contributing factor to the plaintiff allegedly being disabled, within the meaning of the Act, as of June 30, 1958.

Plaintiff claims that he suffered from stomach trouble for a number of years prior to his March 1958 visit to Dr. Coleman and that he has taken medication for this condition since that time. The medication in question is the antacid Amphojel. This stomach trouble was first diagnosed as an ulcer by Dr. Gibson in July of 1961. At that time, however, Dr. Gibson did not appear to base what he considered plaintiff's disability on the ulcer, but rather upon his need for psychiatric care. In fact as late as May 13, 1964, Dr. Wilkinson was of the opinion that the ulcer condition would improve with proper diet and drugs. The record discloses that plaintiff has never followed a strict diet with regard to this condition and that a number of the medical reports clearly indicate that the condition is remedial.

With respect to the long duration of this stomach condition, it is interesting to note plaintiff's testimony regarding his ability to work at his last job in late 1957 and early 1958, (R–24),

"Q. All right, tell me about the circumstances when you quit that job—when you left it—were you laid off, were you fired, did you quit or what?

"A. No, I was laid off—but I wasn't able to work.

"Q. Well, had you been missing time from work?

"A. Naw, I didn't miss a day.

"Q. But you felt physically that you were not able?

"A. Yeah, I still feel that way, and I'se gettin worser all the time."

It is difficult to say whether plaintiff's frequent spells of nausea are caused by his stomach ulcer or his nerves. In either event it does not appear that there is a lack of sufficient evidence to support the Secretary's finding that this condition alone or in combination with other afflictions failed to disable him within the Act's meaning when the earnings requirements were last met. That they may have produced qualifying disability subsequent to that crucial period is immaterial to this inquiry.

The nervous or mental condition is mentioned in almost every item of medical evidence. Some make it the basis of the alleged disability. The psychiatric report of Dr. MacAulay, in May of 1960,

diagnosed plaintiff's condition as inadequate personality, with chronic psychoneurotic overlay. It is interesting to note that Dr. MacAulay did not state that he felt plaintiff was unable to work because of this condition, but rather that he did not believe he was likely to return to work. The same tenor can be detected in the reports of Dr. Clark, Dr. Harlow and Dr. Huffman, to the effect that it is not the mental condition that has resulted in the disability, but rather it is plaintiff's mental attitude which makes the likelihood of his going back to gainful employment doubtful.

Even if it is assumed that this state of mind regarding employment has continued for such a period that it has now created the degree of mental disability required, the medical evidence is meager that would support a finding that less than six months after plaintiff had been laid off from a job, from which he had never missed a day's work because of illness, his mental condition became such that it could be expected to prevent him from engaging in any substantial gainful activity. Particularly is this true in view of the fact that there is credible medical evidence two and three years later which makes no such finding. Courts cannot base judicial judgment upon such a vague and speculative premise.

Unlike the case of Beggs v. Celebrezze, 356 F.2d 234 (4th Cir. 1966), wherein the medical testimony indicated a steady and increasing deterioration of the claimant's mental condition, the instant record makes no such disclosure and in fact the latest medical report, that of Dr. Harlow in May 1965, while stating the patient's chief problem to be his chronic anxiety, found him able to work.

It would be speculative, to say the least, to conclude on the basis of the present record that plaintiff was suffering from Parkinson's disease as of June 1958. It is recognized that this disease is slow and progressive and difficult to diagnose in its early stages. However, only one physician, Dr. Wilkinson, made this diagnosis and this was five years and eleven months after plaintiff's eligibility expired. Even more significant is the fact that a year later, when the symptoms should have been more pronounced, Dr. Harlow did not diagnose this disease. Nor did Dr. Wilkinson mention it again in his note of November 11, 1965, other than he may have intended to include it as one of the other chronic ailments from which plaintiff was suffering.

It is not impossible for a relatively young man of plaintiff's age to be suffering from Parkinson's disease. There are instances of its occurring in individuals in their 20's and 30's. It is generally recognized, however, that the first symptom is usually a slight tremor in one of the hands, though this may not appear until late in the disease, Maloy, Nervous and Mental Diseases. In this record, significantly, the first reference to a tremor of the hands is found in the hearing examiner's report of the hearing held January 25, 1963, in which he states: "At the beginning of the hearing some tremor of the hands was evident but these symptoms seemed to gradually disappear as the hearing progressed." There is not a scintilla of evidence relating the inception of this disease back to June 30, 1958.

On this review, we must view the record as a whole not for the purpose of making independent findings, but to determine whether the administrative findings have substantial evidentiary support. If we find that such support exists, as we do, it is our clear duty, under the mandate of the statute, to uphold them, even though we might have arrived at a different conclusion initially. Snyder v. Ribicoff, supra. In this case, however, were we the initial fact-finder, we would be compelled to reject the claim because of the complete failure of the record to establish a medically determinable physical or mental impairment on or prior to June 30, 1958 causing inability in the plaintiff to engage in any substantial gainful activity.

Accordingly, in view of the record as a whole, it is clear that a reasonable mind could very well have reached

the same conclusion as did the Secretary —that the evidence failed to establish the claim asserted.

An appropriate order may be presented making this opinion a part of the record.