**Virgil E. McCHRISTIAN, Plaintiff,**

v.

**DEPARTMENT OF HEALTH, EDUCA-TION & WELFARE, United States of America, Defendant.**

**No. 78-5002.**

United States District Court, W. D. Arkansas, Fayetteville Division.

June 29, 1978.

Niblock & Odom, Fayetteville, Ark., for plaintiff.

Larry R. McCord, U. S. Atty., Fort Smith, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

On February 22, 1977, plaintiff, Virgil E. McChristian, filed his current application for insurance benefits in which he stated that he became unable to work in August, 1975 because of "bad back, shoulders, bad right eye." (Tr. 130–133). On the same date, he filed an application for supplemental security income (individual with spouse) under Title XVI of the Social Security Act. (Tr. 134–137).

The transcript of the proceedings was filed by defendant as required by 42 U.S.C. § 405(g). It contains the proceedings on the claims that were filed July 16, 1973 for disability since April 2, 1973 (Tr. 46). Claim was diagnosed as "1. Residuals of herniated nucleus pulposus, lumbar spine. 2. Arthritis of lumbar-sacral spine." (Tr. 50). Allowed July 31, 1973. Payments were made until October 10, 1975. (Tr. 51–53).

Plaintiff requested reconsideration which was denied and on May 18, 1976, plaintiff was so advised by letter in which the full statement appears:

"Based on the above determination, you have been overpaid $244.70 for November, 1975 through April, 1976 and your wife and children are each overpaid $42.70 for November, 1975 through April, 1976 for a total family overpayment of $2,493.00. The Social Security representative will discuss this matter with you.

"Since you are no longer entitled to disability benefits, your hospital and medical insurance coverage under Medicare ends the last day of June, 1976.

"You should refund the amount shown above within 30 days from the day you get this letter. If you cannot refund the full amount now, you should send a partial payment. You should tell us why you cannot pay the full amount and let us know when you will pay the balance. If you must pay by installments, you should tell us how much you will pay each month and the date on which you will make each payment. In addition, your medical insurance premiums have not been paid for June, 1976. Therefore, you should also include $6.70 to pay for premiums due. Please make your check or money order payable to 'Social Security Administration, Claim No. 432–64–5343 HAB2, HC1,' and send it to us in the enclosed envelope." (Tr. 59–60, exhibit 8).

While the request of plaintiff for reconsideration of the defendant's cancellation of the claim was pending, Dr. Charles H. Stinnett of the Siloam Springs Medical Center on October 10, 1975 wrote defendant:

"The above named patient was in to see me on October 9, 1975, stating that his Disability Social Security had been discontinued. This man, in my opinion, still has some significant disability and is unable to work at his usual occupation.

"His disability was established and I have had no indication of why, when, or where enough improvement of his condition was noted that his disability should be stopped.

"I would like very much for you to reconsider his case, and if I do not have pertinent information, please call me." (Tr. 105).

On June 18, 1976, the doctor advised that in his opinion the plaintiff "is still unable to work." (Tr. 112). There are statements from others to the effect that plaintiff continued unable to work.

Jerry Thomasson was appointed the Administrative Law Judge to conduct a hearing on the question of the continuation of his disability and whether he should be required to repay the alleged overpayment of benefits. As Administrative Law Judge, Mr. Thomasson on November 18, 1976 filed his opinion in which he stated:

"The evidence in this case discloses the claimant, in fact, was injured in 1973, that a period of disability was established for him as of that time. It ended in August, 1975. His period of disability was ended because a neurosurgeon was unable to find objective evidence of an impairment.

"Although the treating physician did feel the claimant is still disabled because of back surgery that he had, his opinion must fall before that of the neurosurgeon within whose speciality the problem lies.

"It is therefore felt that the preponderance of the medical evidence supports a finding that his disability did cease as of August 1, 1975.

"Notwithstanding the fact his disability was ceased as of August, 1975, the claimant continued to receive benefits through April of 1976, and was therefore overpaid in the amount of $2,493.00. It is felt, after viewing all the evidence, that this overpayment was not the fault of the claimant and to require repayment would violate the intent and purpose of the Social Security Act." (Tr. 126–127).

The current applications were denied on April 4, 1977. (Tr. 138–139). In the statement denying the claims, it is stated:

"Glen Sizemore, MD–Rept of 3–7–77. Donald Weaver, Family Practitioner-Rept of CE of 3–29–77. The claimant has pain in the low back & hip. He also has pain in the head. Physical exam was essentially normal with the exception of x-ray evidence of back surgery previously performed. There was also some evidence of degenerative arthritis, of the lumbar spine. Neurological exam was normal. Since the claimant retains the RFC to engage in work which is available to him in the economy, the claim is denied." (Tr. 139).

On April 6, 1977, plaintiff was notified that he was ineligible to receive supplemen-

**1214**

tal security income payments under the provisions of Title XVI of the Social Security Act. (Tr. 143).

On April 21, 1977, he was notified that his current application for disability insurance benefits was denied. (Tr. 145).

On April 29, 1977, plaintiff requested a hearing and David T. Hubbard was designated Administrative Law Judge to conduct the hearing which was held September 14, 1977. On October 18, 1977, the Administrative Law Judge filed his decision (Tr. 9–15) denying both claims.

Plaintiff requested a review of the disallowance of the Administrative Law Judge's decision. On December 1, 1977, the Appeals Council advised him that further consideration of the decision would not result in any change that would benefit plaintiff and "accordingly the hearing decision stands as the final decision of the Secretary in this case". (Tr. 4–5). He was further advised that he may commence an action in the District Court. On January 10, 1978, plaintiff filed his complaint (petition) against defendant in which he alleged:

"(6) That this plaintiff states and alleges that he is 41 years old, and has a sixth grade education. That his work experience had consisted of being a cook at Steele Canning Company and as a mixer at a plastic pipe company. That he has been continuously disabled since April of 1973, and that his disability is of a total and permanent nature. That disability benefits were awarded by an Administrative Law Judge, but that such benefits were arbitrarily terminated in August of 1975. That plaintiff is no longer able to engage in any substantial, gainful employment. That because of said disability, this plaintiff is wholly unable to work and has been disabled since April of 1973. That this plaintiff has received treatment from various doctors and physicians, however, said treatment has been unsuccessful in restoring the plaintiff to where he can, again, perform any substantial, gainful employment. That by reason of said medically determinable physical impairments and/or sum total of all his illness, this plaintiff's disability is expected to be long continued and of an indefinite duration. And, further, that by reason of said disability, plaintiff is entitled to the benefits provided by the Social Security Act."

On April 26, 1978, the defendant filed his answer to the complaint denying that plaintiff is entitled to the benefits that are the subject matter of the action and further alleges that the decision of the Secretary is correct and in accord with the applicable law and regulations.

On May 30, 1978, defendant filed motion with brief in support thereof to affirm decision of the secretary and alleged "there is no dispute as to any material fact, and that defendant is entitled to judgment as a matter of law."

On June 8, 1978, plaintiff filed a motion with brief in support thereof, to reverse the decision of the secretary and alleged "there is a dispute as to material issues of fact and that there is not substantial evidence to entitle the defendant to judgment as a matter of law."

It is noted that defendant in his motion alleges that "there is no dispute as to any material issue" and plaintiff alleges "there is a dispute as to material issues of fact and that there is not substantial evidence to entitle the defendant to judgment as a matter of law."

In order to decide the contentions of the defendant as set forth in its motion to affirm the decision of the Secretary and the motion of plaintiff of June 8, 1978 to reverse the decision of the secretary, the court must examine and consider the evidence.

At the hearing before Administrative Law Judge Hubbard on September 14, 1977, the plaintiff, Virgil E. McChristian, testified (Tr. 25–40) that he was born February 7, 1936. He has a sixth-grade education and lives on Route # 2, Box 46, near Gentry, Arkansas with his wife and children. All of the children are under the age of 18 except one. His wife is employed at Peterson's Hatchery located at Decatur, Arkansas.

He is about six feet tall and weighs 190 lbs. His daily activities consist of taking his wife to work and then back home for the rest of the day. He does what little he can around the house but he cannot do too much without his back bending him over. He lies down at times, sits down at times and works some. "If I sit down five minutes, I stiffen up some, but I can sit there longer."

The boys do the yard work and have a row or two about six feet long of vegetables.

Ralph Jones was the last place he worked before he got hurt. A while back, Bob Kern thought he had a light job that he wanted him to try, watching an auger and punching a few clocks with it. He watched it for him part of the day. The next day, he had trouble because his back had stiffened up and it was about three days before it "let up". He testified about two other jobs but was unable to do any of them. The Administrative Law Judge asked him to tell about his back condition, how it affected him. He answered: "Well, the way it works, they operated on this low down and they freed this leg up, you know, it wouldn't hardly bend and they freed it through the operation, but other than that the hip and in there hurts just about like it did before they operated. In the middle of my back here, just sitting down, I am telling you, you can sit down five minutes and it will stiffen up to a certain percentage. Of course, the longer you sit, the stiffer it will get. On up higher, up in here, there is some joints that are sore and they hurt and they—if you try to use them—it will get deeper."

Mr. Gerald Congrove, a friend, drove plaintiff to the hearing before the Administrative Law Judge, and testified that he had known plaintiff since 1946. He was regularly employed until 1973. After he got "big enough to work, he was always working. Since 1973, he has tried to work. He was a worker, a hard worker. I was gone from 1970 to 1973 and when I came back I was astonished at the condition he was in."

On reexamination by the Administrative Law Judge, he was asked about one of the medical reports which describes severe headaches and whether he was still having those. He answered:

"Yeh, I had them—that's when I tried that up there, I had them and my back would stiffen up. That's what I'm telling you. This top part is a deep hurt and will get deeper and this heat bulb helps. That is this deep part out and between the light and my medicine it is helping but it will not control it."

On March 1, 1977, following the filing of the current application, a disability examiner wrote Dr. Stinnett of Siloam Springs and asked him to furnish medical information from their records, including a history, physical and laboratory findings with diagnoses. Also, x-ray reports and describe any joint pain with swelling, morning stiffness which persists on activities, degree of both active and passive ranges of motion of affected joints, periarticular muscle wasting, joint deformities and other findings of severe disease, motor reflex and sensory squat, grasp and handle subjects. Dr. Stinnett replied on the same letter as follows:

"Virgil McChristian's physical condition has not changed since my previous reports, 2/11/74, 2/6/76 and 8/4/76, 9/18/76. If further information is necessary, I suggest he be seen by a specialist." (Tr. 166).

On March 7, 1977, Dr. Glenn W. Sizemore, M.D., of the Mayo Clinic, Rochester, Minnesota made the following statement:

"Mr. Virgil E. McChristian of Rural Route 2, Gentry, Arkansas, was evaluated at the Mayo Clinic between February 21 and March 1, 1977. Our final diagnoses were headache due to nasal vasomotor instability (severe); tension myalgia; degenerative joint disease and scoliosis of the lumbar spine; status post L–5 hemilaminectomy; anxiety and situational neurotic depression. It was the considered opinion of myself and my colleagues, Dr. Donald Layton of the Department of Neurology and Dr. Gordon Moore of the Department of Psychiatry,

that Mr. McChristian is disabled from normal work on the basis of his vasodilating headaches and tension myalgia. We suspect this disability will be permanent because none of us had much confidence that we could modify the problem to the point where he could resume gainful employment in his previous occupations as a factory laborer.

"He weighed 191 pounds, was 71.9 inches tall, had an initial blood pressure of 140/100 mm. of mercury with subsequent values of 125/80 to 90 and a regular pulse of 100. Although he has coarse features, they were not sufficient to diagnose acromegaly. The patient walked with a left limp and had slight tenderness around the left hip joint. His neurological examination was normal. There was grade I enlargement of the prostate gland.

"The following laboratory studies were abnormal: Plasma triglycerides were 210 mg. percent (normal less than 189). His total thyroxine binding globulin was low at 11.7 mcg. percent (normal greater than 16). There was a calcified granuloma in the right midlung laterally. Lumbar spine films showed changes of a left hemilaminectomy at L–5, mild lumbar scoliosis with hypertrophic changes and pantopaque present in the spinal canal. The following laboratory studies were normal or negative: Hemoglobin, hematocrit, erythrocytes, erythrocyte indices, leukocytes, leukocyte differential, erythrocyte sedimentation rate, fasting plasma sodium, potassium, calcium, phosphorus, total protein, glucose, alkaline phosphatase, SGOT, total and indirect bilirubin, uric acid and creatinine. The total thyroxine, fasting growth hormone, creatinine kinase, 24 hour urine content of calcium and phosphorus, routine urinalysis, protein electrophoresis, serum cholesterol, urine content of VMA and HVA, routine urinalysis and radiographs of the hands, cervical spine, thoracic spine, shoulders, head and feet were also normal or negative.

"Mr. McChristian has an unusual history of head and eye pain associated with nor-

mal examination. The pains are anticipated by tension in his shoulders and associated with contraction of the trapezius muscle. The frequency is one to eight per 24 hours and he is often awakened by them. No medications have controlled them successfully in the past. Best relief comes from remaining inert during the attack. Although we recommended Soma Compound, one q.6 hours on a trial basis during the next two weeks, we are not sure this will help. If Soma Compound is not helpful, Benadryl 50 mg. q.8 hours could be tried. Previous administration of Prednisone was hot helpful. All of us would be reticent to try long-term glucocorticoids or methysergide for this problem in Mr. McChristian.

"Because of the severity and frequency of the headaches and his lack of skills and much formal education, we assume that it would be most difficult to gain and maintain permanent gainful employment. For these reasons we believe he is disabled from usual work. We have not completed formal evaluation of complaints relating to an upper thoracic pain which started following an injury eight years ago. Mr. McChristian has an appointment for disability evaluation by an orthopedist in June of 1977. He was instructed to keep this if he believes that it is necessary." (Tr. 168–169).

On September 18, 1976, Dr. Charles H. Stinnett made the following statement:

"This man had been followed here since 1972, with a back ailment which required surgery for herniated disc in August of 1973. This man has continued to have much back pain and muscle spasms which have prevented any type of gainful employment.

"He was seen with Dr. Johnson in August of 1975, and diagnosis was chronic low back strain, post-op HNP was given, and strong functional overlay.

"I agree with this diagnosis to a point but the patient still has severe muscle spasms and pain to the point that I feel he can not do any type of strenuous labor. This man is not educated and is not capable of

any other type of employment, other than hard work. Therefore, my feeling is, this man should be considered permanently and near totally disabled.

"If any further information is necessary, please let me know." (Tr. 120).

On April 1, 1977, Dr. Donald D. Weaver of Gentry Health Service gave a general outline of plaintiff's physical condition but didn't express any opinion. (Tr. 173–174).

Dr. M. D. Cabanella, of the Rochester Clinic, on July 1, 1977, by letter summarized his physical condition and stated:

"X-rays showed degenerative disc disease of lumbar spine."

He further stated that the low back pain was not mechanical and that plaintiff could not carry out heavy work but could do light work if properly retrained. (Tr. 176).

On January 31, 1977, Dr. Carl M. Kendrick of Fayetteville also wrote about the condition of the plaintiff and confirmed the statements already given by other doctors. (Tr. 177).

42 U.S.C.A., § 405(g) provides:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Secretary or a decision is rendered under subsection (b) of this section, it is adverse to an individual who was a party to the hearing before the Secretary, because of failure of the claimant or such individual to submit proof in conformity with any regulations prescribed by subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations."

The chief question now before the court is whether the findings of the Secretary are supported by substantial evidence. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed. 842; *Celebrezze v. Bolas,* (8th Cir.) 316 F.2d 498.

In determining whether the action of the Secretary is supported by substantial evidence, the court in *Richardson v. Perales,* supra, at page 401 of 402 U.S., at page 1427 of 91 S.Ct. held that substantial evidence is "more than a mere scintilla, [which] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

The concept of disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which  .   .   . has lasted  .   .   .  for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(a) (1970).

In 423(d)(3), physical or mental impairment is further defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

In *Timmerman v. Weinberger,* (8 Cir.) 510 F.2d 439, the court held that in reviewing the record to ascertain whether there is substantial evidence to support the Secretary's findings the court should look to four elements of proof: (1) the subjective medical facts; (2) the diagnoses and expert opinions of treatment and examining physicians on subsidiary questions of fact; (3) the subjective evidence of pain; and (4) the claimant's educational background, work history and her present age.

The court, in *Timmerman,* supra, at page 442, said:

"In the instant cases, as in most, the major area of contention centers around the second prong of the threefold requirement: that there be an inability to engage in any substantial gainful activity. It is clear that the claimant need not be a total "basket case" before the courts find that there is an inability to engage in substantial gainful activity. See, e. g., *Yawitz v. Weinberger,* 498 F.2d 956 (8th Cir.) supra. The question must be looked at in a practical manner, and mere theoretical ability to engage in substantial gainful activity is not a sufficient basis to deny benefits. The test is whether a particular job is realistically within the physical and mental capabilities of the claimant. *Thomas v. Richardson,* 371

F.Supp. 362, 364 (S.D.N.Y.1974); *Lebron v. Secretary of H.E.W.,* 370 F.Supp. 403, 407 (D.P.R.1974)."

In *Thomas v. Richardson,* 371 F.Supp., page 364, the court said:

"It is settle that a 'mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available.' *Kerner v. Flemming,* 283 F.2d 916, 921 (2d Cir. 1960); *Celebrezze v. Bolas,* 316 F.2d 498, 501 (8th Cir. 1963). The test is what is 'reasonably possible, not what is conceivable,' *Klimaszewski v. Flemming,* 176 F.Supp. 927, 932 (E.D.Pa.1959), in view of the fact that the Act is remedial and is to be construed liberally, *Kohrs v. Flemming,* 272 F.2d 731, 736 (8th Cir. 1959); *Celebrezze v. Bolas, supra.*"

In *Gray v. Califano,* (S.D.Cal.1978) 448 F.Supp. 1142, the court at page 1145 said:

"In evaluating a disability claim the Secretary must conduct an individualized analysis since different people can react in markedly different ways to the same impairments. *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir. 1974). Thus, the ALJ's decision, based as it is on such meager evidence, must be remanded so the Secretary can fully inquire into the severity and remediability of Mr. Gray's alcoholism. Furthermore, the Secretary can ensure that all of Mr. Gray's impairments are considered in combination."

The transcript is badly arranged. Very little attention was given by the compiler to sequence. But a search of the document discloses without material dispute from anyone that the plaintiff is totally and permanently disabled within the meaning of the Social Security Law and the findings and conclusions of the defendant, Secretary, are not supported by substantial evidence. In the opinion of the court, there is not even a scintilla of evidence in support of the conclusion reached by the Secretary in his denial of the current claim of the plaintiff and judgment should be entered overruling the motion of defendant to affirm the decision of the Secretary and granting the motion of plaintiff to reverse the decision of the Secretary.