George A. VANCE, Plaintiff,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 2331.

United States District Court
S. D. West Virginia,
Huntington Division.

Aug. 17, 1967.

Arthur T. Ciccarello, Charleston, W. Va., for plaintiff.

Milton J. Ferguson, U. S. Atty., and George D. Beter, Asst. U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education, and Welfare. A decision by a hearing examiner on January 31, 1967, became the final decision of the Secretary on March 30, 1967, when the Appeals Council, pursuant to a request for review by the plaintiff, affirmed it. The final decision holds that plaintiff, on the basis of his application filed September 13, 1965, is not entitled to a period of disability or disability insurance benefits under the provisions of the Act prior or subsequent to the 1965 Amendments.[1]

■ Plaintiff last met the special earnings requirements of the Social Security Act as of September 30, 1963. Under the Act, 42 U.S.C.A. § 416(i), an individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required. To meet this requirement, the claimant must establish that he suffered from such disability on or before the last day of his special insured status. Davidson v. Ribicoff, 204 F.Supp. 368 (S.D.W.Va.1962). Thus, the burden is upon the plaintiff to establish by credible evidence that he was disabled within the meaning of the Act prior to September 30, 1963, when he last met the insured status, though such proof need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

Plaintiff's present application was filed on September 13, 1965, alleging that he became disabled in June 1963, as a

---

1. Section 303(a) of Public Law 89-97, 79 Stat. 286 (the 1965 Social Security Amendments) amends the meaning of the term "disability" as found in 42 U.S.C.A. § 423 as follows: "(I)nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months * * *." Previously the physi- cal or mental impairment had to " * * * be expected to result in death or to be of long-continued and indefinite duration."

Under the provisions of Section 303(f) of the law a period of disability may be established by use of this amended definition. However, benefits would only be payable beginning in September of 1965 or the seventh month in which an individual has been determined to be under a disability under the amended test, whichever is later.

result of "Gastric ulcers, arthritis, bad legs, dizzy spells, & short of breath."[2] He had previously filed an application on January 1, 1962, alleging that he became unable to work in June 1961, as a result of "heart murmur, enlarged heart & ulcers; arthritis." This application was denied by the Bureau of Old-Age and Survivors Insurance on March 5, 1962, and became the final decision of the Secretary as a result of the failure of the plaintiff to request a reconsideration of such initial determination. 20 C.F.R. Section 404.908. The Social Security Regulation, 20 C.F.R. Section 404.937, provides,

"The hearing examiner may, on his own motion, dismiss a hearing request, either entirely or as to any stated issue, under any of the following circumstances:

"(a) *Res Judicata.* Where there has been a previous determination or decision by the Secretary with respect to the rights of the same party on the same issue or issues which has become final either by judicial affirmance or, without judicial consideration, upon the claimant's failure timely to request reconsideration, hearing, or review, or to commence a civil action with respect to such determination or decision."

The hearing examiner found that neither the testimony at the hearing nor the medical reports admitted into evidence created any new issues with respect to the period covered by the 1962 application. As a consequence of this determination, the examiner, applying the pre-1965 definition of disability, found that the denial of the 1962 application was *res judicata* with respect to plaintiff's 1965 application. In considering the period subsequent to the 1962 determination and prior to the expiration of his insured status, the hearing examiner found that plaintiff had failed to establish that he was disabled within the meaning of that term, as defined in either the prior law or the 1965 Amendments.

■ The standard of review in actions of this nature is found in Section 205 (g) of the Act, as amended, and is as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

In short, the Courts are not to try the case *de novo*, and if the findings of the Secretary are supported by substantial evidence, the Courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Nevertheless, it is said that this provision of the law does not contemplate that the Courts should surrender their "traditional function," but rather that they will view the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the administrative finding is supported by substantial evidence and to see to it that the administrative agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Cele-

2. At the hearing, plaintiff, through his attorney, took the position that the onset date of the alleged disability under the present application was June of 1961 instead of June 1963, as was alleged in the application, and the evidence as presented, both the testimony and the medical reports, related back, in part, at least as far as the earlier date. The hearing examiner, however, in his decision confined his findings, with respect to the 1965 application, to the period between June of 1963—the date alleged in the application—and September 30, 1963—the date plaintiff last met the special earnings requirement of the Act. This strict adherence to the date initially alleged in the application was clearly erroneous and, for the purposes of this review, the earlier date will be considered as controlling. Rule 15(b) of the Federal Rules of Civil Procedure, though not directly applicable to a decision of the hearing examiner, providing for an amendment of the pleadings to conform to the evidence as presented at the trial, supplies a valuable and appropriate guide in solving problems of this nature. Thus, we are admonished to allow such amendments in order to facilitate the trial of a case on its merits and to avoid what has been described as the "tyranny of formalism." Rosden v. Leuthold, 107 U.S.App. D.C. 89, 274 F.2d 747 (1960).

brezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir. 1962). In determining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. It is such evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. Therefore, the immediate task of this Court on this review is to determine whether the defendant's denial of the plaintiff's claim is supported by substantial evidence.

It is clear that the doctrine of res judicata is applicable to the present application as to the awarding of benefits prior to March 1962 by use of the old definition of disability. Sowards v. Gardner, 264 F.Supp. 709 (S.D.W.Va. 1967). Moreover, the instant application with respect to the period between the date of the denial of the 1962 application and the expiration of plaintiff's insured status in September 1963 is subject to review under the old definition of disability, since the res judicata effect of the 1962 decision is not prospective in its operation. However, in view of the fact that the very standard on which the prior adjudication was made has been changed and recognizing that part of the purpose of such change was to relieve the stringency of the old test, a determination of the instant application of whether plaintiff was disabled on or before September 30, 1963, the expira-

tion date of his insured status, requires the application of the new and more liberal definition.[3]

Plaintiff was born on March 7, 1910, at Emmett, West Virginia. His formal education was confined to six and one-half years of school, however, he is able to read and write. His previous employment, with the exception of a four-month period in 1943 when he worked as a laborer for the city of Dayton, Ohio, has involved work in the coal mines in several different capacities. Prior to 1947, he worked as a motor operator, motor brakeman, and lampman.[4] From 1947 to 1960 he worked as a dispatcher. This position involved responsibility for the coordination of the movements of mine cars in underground mines as well as the scheduling of movements of trains hauling materials and personnel to and from the surface. Plaintiff last worked in the mines in August of 1960, when his employer ceased operations in the mine in which he was employed. Although another mine was opened, plaintiff did not thereafter attempt to secure a position there since, according to his testimony, his doctor advised against his working inside a coal mine because of the condition of his lungs.

From May 1962 to August 1965 plaintiff worked under the ADCU program. Workers under this program are normally employed for the purpose of cleaning and clearing public roads, and to qualify one must be able to do the work required of him; it is not designed for the disabled. Plaintiff testified that he "didn't do anything" but "lay around in the shade." In a report from the supervisor, it is stated that plaintiff was "unable to do heavy work, only light work, such as flagging." In 1965 he was found by

3. A distinction with respect to a finding of disability under the old or the new definition may become important, especially to the plaintiff, since under the old definition payments may be made for the twelve months preceding the month in which the application was filed, while under the new definition benefits would only be payable beginning in September 1965 or the seventh month in which an in-

dividual has been determined to be under a disability, whichever is later.

4. The principal duties of the lampman include: Cleaning and repairing lamps and batteries, replacing worn and broken parts, and filling the lamps and batteries with the necessary chemicals. Such a position involves only light work and can be placed in that category of labor which is classified as "sedentary" in nature.

reason of age to be qualified for a miner's retirement pension under the United Mine Workers' program and was thus no longer eligible for employment under the ADCU program. He has not engaged in any work activity since he became eligible for the miner's pension.

Only two of the medical reports offered into evidence were concerned with medical findings made prior to the expiration of plaintiff's insured status in September of 1963.[5] The first of these is that of Dr. S. L. Cooke, dated September 25, 1961. Plaintiff was treated for acute right maxillary sinusitis which was apparently caused by a fall at his home resulting in multiple fractures of the right zygoma. Following treatment, his condition was described as asymptomatic and he evidently has had no further problems with this particular ailment.

The next medical report, that of Dr. George L. Fischer, indicates that in August of 1961 plaintiff was suffering from abdominal pain which was the result of a twenty-year history of epigastric distress. The doctor noted that there had also been some lower urinary tract difficulty. Otherwise, his past history was negative. A complete physical examination resulted in findings which were within normal limits. Urinalysis was negative on two occasions. X-ray of the chest was normal. An X-ray of the upper gastrointestinal tract, however, revealed a duodenal ulcer. He was placed on a six-meal ulcer diet, with Aludrox between meals and phenobarbital 30 mgs. four times a day. Dr. Fischer saw him again on August 28, 1961. At this visit, plaintiff stated that his gastrointestinal symptoms had been relieved by the prescribed regimen. He was then discharged and told he should return as necessary.

In a discharge summary concerning plaintiff's hospitalization from September 20, 1965 to September 29, 1965 in the Appalachian Regional Hospital, Man,

West Virginia, Dr. Cesar J. Lesaca found his chief complaints to be shortness of breath, dizziness, and pain in the legs. He is described in this report as a "well developed, well nourished, 55 year old white male." His blood pressure was 130/90. Upon examination, the head, eyes, ears, nose, and throat were found to be "not remarkable." The thyroid gland was normal; chest was clear, however, minimal emphysema was diagnosed by the physician; heart was normal and the sinus rhythm was without murmur. He had normal reflexes. A rectal examination showed a slightly enlarged soft prostate gland; electrocardiogram was within normal limits; chest X-rays revealed pulmonary emphysema and fibrosis; upper gastrointestinal series showed a minimal deformity of the duodenal bulb without active ulcer; gall bladder series proved normal; serology was non-reactive; complete blood count was within normal limits; and urinalysis proved negative. As a result of hospital treatment, the doctor reported that plaintiff made an uneventful recovery and was permitted to return home asymptomatic on September 29, 1965. Dr. Lesaca's diagnosis was pulmonary emphysema with fibrosis, benign prostatic hypertrophy, and a healed duodenal ulcer.

Plaintiff was again examined by Dr. Lesaca on October 6, 1965. The symptom with which the doctor was apparently primarily concerned in this examination was a shortness of breath which plaintiff was then experiencing. As a result of a chest X-ray, the doctor determined that this ailment was the result of pulmonary emphysema and fibrosis, which he described as "static." He also found that plaintiff was suffering from osteoarthritis, but offered no opinion as to the extent or effect of this disease. A benign prostatic hypertrophy was also noted. It was Dr. Lesaca's opinion that he was "unable to do any gainful occupation."

5. A "Report of Contact, dated March 30, 1966, indicates that the Veterans Administration found plaintiff "not disabled" in 1962. The report further states that he did not want the V.A. records included in his present file.

Plaintiff was examined on February 18, 1966 by Dr. L. R. Elias. This report states that he was suffering from a chronic cough, exertional dyspnea and recurring chest pains. He is said to have had epigastric pain for a period of about two to three years with much indigestion, gas, heartburn, and an intolerance to many foods. He had multiple low back and joint pains which had gradually progressed to the point of moderately severe pains during the past five years. In the opinion of Dr. Elias, this pain was the most significant factor involved in what he termed plaintiff's "disability." Plaintiff's response to the usual antiarthritic medications had only been fair to poor and his "peptic ulcer" had prevented the use of any stronger preparations. Respiration involved the use of accessory muscles of respiration; the diaphragm was found to be low and breath sounds were depressed throughout; and a deep epigastric tenderness without rebound was noted. Examination revealed a tenderness along the dorsal and lumbrosacral spine and an evident discomfort on flexion, extension or lateral bending of the spine. A loss of lumbar lordosis and moderate paraspinal muscle tenderness was noted. Crepitation was evident in the right knee when in motion. A rectal examination revealed the presence of an enlarged prostate gland. Chest X-rays revealed accentuation of vascular and bronchial markings which would be consistent with chronic bronchitis. A granular infiltrate, scattered throughout the lung fields and suggestive of silicosis was noted by the doctor. An examination of the dorsal spine revealed osteoarthritis and osteoporosis with the intervertebral discs calcified. There had been moderate degenerative changes in the lumbar spine especially at the L1, L2, L5, and S1 levels. The intervertebral disc space between L1 and L2 and between L5 and S1 were found to be moderately narrowed. Blood count, urine and electrocardiogram were reported as being normal. It was Dr. Elias' opinion that plaintiff was totally disabled.

Plaintiff's next examination, resulting in a thorough and lengthy medical report, was performed by Dr. Rowland Burns on May 9, 1966. As a result of a complete respiratory examination, including chest X-rays, a flouroscopic examination, and breathing tests, Dr. Burns reached the following conclusions concerning his condition: Pulmonary fibrosis, linear and fine nodular, mild; bronchitis, chronic, minimal; pulmonary emphysema, minimal; pulmonary dysfunction, mild, with an estimated total impairment of approximately 29%. A clinical diagnosis revealed mild osteoarthritis of the spine, manifested by a slight limitation of neck flexion; however, there was no objective evidence of osteoarthritis involving the extremities and no significant limitation of joint mobility. In the doctor's opinion, there was no considered evidence of arthritis which could contribute to a disability of plaintiff at the time of the examination. With respect to the peptic ulcer, his weight and nutrition were found to be satisfactory and his symptoms were not those of an active peptic ulcer disease. He had no history, nor was there any clinical evidence, which indicated an obstruction, perforation, penetration, or abnormality of the peptic ulcer. A benign prostatic hyperplasia without evidence of urinary infection was noted. An examination of the ears revealed a decrease in hearing, more severe on the right, with tinnitus (a subjective sensation of sound in the ears) and episodes of vertigo occurring with any sudden change of position. Orthopnea, requiring that plaintiff sleep on two pillows, was noted. The lungs were clear to percussion and auscultation and the chest contour and expansion were found to be normal. Heart size was normal with no evidence of murmur. With respect to the abdomen, no masses or organs were palpable. Peripheral vascular pulsations were described as adequate. Normal external genitalia was noted. Albumin and sugar tests resulted in negative findings. Electrocardiogram and Double Masters Two Step Exercise Test were reported as

normal. In a comment contained in the report, the doctor states that the plaintiff performed 9,540 foot pounds of work in 3.16 minutes without evidence of embarrassment of the cardiac or circulatory systems. His diagnosis with respect to plaintiff's pulmonary fibrosis concludes that it was "not considered in any degree unusual, or more severe than that commonly seen in persons with more than 30 years experience working in the mines." The pulmonary function studies revealed, in the doctor's opinion, only a mild impairment and did not produce any significant disability of the "whole man." With respect to the osteoarthritis, Dr. Burns states that "this type of arthritis is that commonly seen in persons in this age group." He felt that plaintiff's subjective complaints were out of proportion to the objectively demonstrable physical and laboratory abnormalities.

The final medical report admitted into evidence is that of Dr. Harold Van Hoose, dated October 14, 1966. He states, in rather brief fashion, that he has "treated Mr. George Vance on frequent occasions for hypertension, emphysema and gastric ulcer since 1960. He was not able to pass any physical exam for work during that time."

■ In determining whether or not the Secretary's determination that plaintiff was not disabled within the meaning of the Act prior to September 30, 1963, is supported by substantial evidence, the Court must examine not only the objective medical findings of the examining and treating physicians, including their diagnoses and expert medical opinions, but also the subjective evidence of pain and disability. Underwood v. Ribicoff, supra; Dillon v. Celebrezze, 345 F.2d 753 (4th Cir. 1965). The present record is replete with evidence concerning the effect upon plaintiff of the medical impairments shown by the documentary materials. Plaintiff testified at the hearing that he "would have spells where I would blackout, and I was short of breath, and I had arthritis." When he suffered from what apparently was the vertigo mentioned in Dr. Burns' medical report, his "head would just go to swimmin' just like the building was turning over and over with me and I couldn't see and I would just have to fall." He stated that, in addition to these symptoms, his back and shoulder bothered him and he suffered from severe headaches.

Plaintiff has had the burden of coming forward with competent evidence from which it can be established that on or prior to September 30, 1963 he was unable, because of a medically determinable impairment, to engage in any substantial gainful activity. In the evidence, both testimonial and documentary, it seems apparent that there is substantial evidence to support the Secretary's finding that neither on nor prior to September 30, 1963 was plaintiff suffering from a medically determinable physical or mental impairment of such severity as to render him unable to engage in any sustantial gainful activity. Although there is some conflict in the medical testimony, there is substantial evidence of record which indicates that while plaintiff may have been suffering from various ailments, his response to medical treatment was always positive and, indeed, on two occasions his condition, following medication, was described as asymptomatic.

With respect to plaintiff's spinal condition, while Dr. Elias diagnosed osteoarthritis and osteoporosis of the dorsal spine and stated that in his opinion this impairment was the most significant factor involved in plaintiff's disability, Dr. Burns, following a thorough examination, could find no objective evidence of osteoarthritis and no significant limitation of joint mobility. In addition, it was Dr. Burns' opinion that plaintiff's subjective complaints were out of proportion to the objectively demonstrable abnormalities.

■■ Plaintiff's most serious complaints, and those which apparently had the greatest effect upon his alleged disability, were related to his respiratory difficulties. In this instance also, the opinions of the various members of the medical profession are in conflict. Although Dr. Burns uses such terms as

"mild" and "minimal" to describe the pulmonary fibrosis and pulmonary emphysema with which plaintiff is afflicted, Dr. Lesaca felt such condition rendered plaintiff "unable to do any gainful occupation." However, it is not the duty of this Court to resolve such conflicts; that is the function of the fact finder and if, as is the case here, the findings have substantial evidentiary support, notwithstanding the evidence might permit a different conclusion, they are conclusive upon review in this Court, Underwood v. Ribicoff, supra. Of course, plaintiff's testimony, as well as that of his wife, concerning the effects of his alleged impairments would, if accepted, be significant in determining whether or not he had met his burden of establishing a disability as that term is defined by the applicable statute. However, it is not within the province of this Court to evaluate and to weigh the evidence. To do so would be to allow claimant a trial *de novo,* which is contrary to the force given the Secretary's determination by statute. This is particularly true in this case where it was necessary for the Secretary to evaluate the credibility of witnesses and to resolve conflicts in the evidence—matters here, as always, most appropriately left to the trier of fact. Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966); Williams v. Celebrezze, 353 F.2d 74 (4th Cir. 1965); Smith v. Gardner, 253 F.Supp. 991 (D.C.S.C.1966). Considering all the medical evidence, the evidence concerning plaintiff's employment under ADCU, as well as the testimony of plaintiff and his wife, we cannot, therefore, in good conscience say that the Secretary's finding is not supported by substantial evidence of record.

The Secretary's findings are given additional support by the testimony of Miss Hattie B. Spangler, a vocational expert. After reviewing all the evidence of record and hearing all the testimony presented, Miss Spangler concluded that not only were there jobs available which the plaintiff could perform, but also, and more important for the purposes of this case, plaintiff could have returned to his prior jobs of lampman and dispatcher in the coal mines.

Accordingly, viewing the record as a whole, it is clear that a reasonable mind could very well have reached the same conclusion as did the Secretary—that the evidence failed to establish the claim asserted—and that being so, the defendant's motion for summary judgment must be granted.