Rosa Mae CROCKETT, Plaintiff,

v.

Wilbur J. COHEN, Secretary of Health, Education & Welfare, Defendant.

Civ. A. No. 68–C–84–A.

United States District Court
W. D. Virginia,
Abingdon Division.

May 12, 1969.

James R. Moore, Abingdon, Va., for plaintiff.

William C. Breckinridge, Asst. U. S. Atty., Roanoke, Va., for defendant.

## OPINION and JUDGMENT

DALTON, Chief Judge.

This case comes before this court upon a petition filed by Rosa Mae Crockett pursuant to the provisions of § 205(g) of the Social Security Act, 42 U. S.C.A. § 405(g), to review a "final" decision of the Secretary of Health, Education and Welfare. The decision holds that Rosa Mae Crockett is not entitled to the establishment of a period of disability, or to disability insurance benefits under the Social Security Act, as amended. The decision, rendered by a hearing examiner on March 18, 1968, became "final" when the Appeals Council affirmed the decision and denied the claimant's request for review on August 14, 1968. The action was filed in this court on August 27, 1968.

The claimant, Rosa Mae Crockett, filed an application for disability insurance benefits on January 5, 1966, with the alleged disabilities being arthritis and nerves. It is alleged that the impairments prevented the claimant from working from April 23, 1964. By letter dated December 16, 1966, the claimant was notified that her impairments were not disabling within the meaning of the law. The letter stated that the claimant would continue to meet the earnings requirement for disability purposes until March 31, 1969, according to the amounts credited to her social security account as of the time the application was filed. Upon reconsideration, the claimant's application was again denied and the claimant was so notified by letter dated July 16, 1967.

Believing these adverse decisions to be erroneous, the claimant requested a hearing which was held in Bluefield, West Virginia on October 10, 1967. The claimant, her mother and a neighbor appeared and testified at this hearing. Various reports were introduced into evidence. By a decision dated October 27, 1967, the hearing examiner held that the claimant was not disabled within the meaning of the Act and Regulations either under the pre-1965 or the amended 1965 definitions of disability. Accordingly the decision held that the claimant was not entitled to the establishment of a period of disability or to disability insurance benefits under the Social Security Act, as amended. Upon review, the Appeals Council, being of the opinion that the record did not contain sufficient information upon which to base a decision, remanded the case to the hearing examiner. The purpose of the remand was to receive additional evidence, especially the testimony of a vocational expert.

The second hearing was held in Bluefield, West Virginia, on February 21, 1968. The claimant, represented by an attorney, appeared and testified. The only other witness to testify was Miss Hattie B. Spangler, a vocational expert. By a decision dated March 18, 1968, the

hearing examiner again held that the claimant was not disabled within the meaning of the Act and Regulations either under the pre-1965 or the 1965 amended definition of disability. The hearing examiner found that during the alleged period of disability the claimant possessed residual work capabilities so as to allow her to engage in substantial work activities. The Appeals Council denied the request for review on August 14, 1968.

According to the testimony, Rosa Mae Crockett was born on December 21, 1920. Possessor of a sixth grade education, the claimant can read and write, although she states that she experiences difficulty in writing because of enlarged finger joints. She is married and lives with her husband in a rural community. There are no dependent children. The claimant's entire work experience was with a television convector factory located in Tazwell, Virginia, where she was employed for a period of approximately ten years. The first years consisted of assembly line work which required the claimant to stand and put paper tubes in a rack and then place condensers into the tubes. The tubes were small ranging from three inches to less than an inch in length. A substance was placed over the parts inserted in the tubes and the rack of tubes was then baked in an oven. This work was performed on a piece-work basis. No tools were employed.

For the last two or three years, the claimant worked as an inspector which required the use of pliers to straighten wire leads on condensers which she was inspecting. Rubber gloves were required to protect against electrical shock. It was also necessary that the claimant check the numbers placed on the condensers to see that they were correct. The job required the claimant to carry pans of condensers, sometimes necessitating the aid of a fellow worker, for distances of from six to eight feet. The inspector job was on an hourly basis. This job was terminated in April, 1964, when the claimant found that she could no longer work because of a nervous condition and arthritis. The claimant did not supervise other personnel in either job that she performed.

A "Doctor's Cumulative Diagnostic Sheet" from St. Luke's Hospital in Bluefield, West Virginia indicates that the claimant was seen on November 2, 1961, for pre-menstrual tension, vulvovaginitis and spastic bowel syndrome. The report also notes that a hemorrhoidectomy was performed on May 21, 1962, because of thrombosed internal and external hemorrhoids. There is also reported a partial intestinal obstruction, post operative (unnamed operation although apparently the obstruction was related to the hemorrhoidectomy), due to inflammation. Dr. James E. McGee, who had made several prior reports, physically examined the claimant on March 2, 1964. His diagnosis was vulvovaginitis with secondary cystitis and the treatment prescribed was drugs and a cream medication. The claimant was requested to return in one week. A week later the report states that the claimant was better, that the inflammation is less and the general effect much improved. The medication dosage was altered to prevent nausea and the claimant was requested to return in two weeks. On March 23, 1964, the patient returned and examinations of the abdominal, pelvic and rectal areas were essentially negative. The claimant was requested to return in six weeks for further observation. On May 4, 1964, the report states that the claimant was seen and at this time she had no particular difficulty as regards the pelvic condition. In response to complaints about pain in the right shoulder an examination revealed some tenderness of the right shoulder, but with no specific point of tenderness. This appeared to be mild myositis and the claimant was placed on medication and was referred back to the care of her own doctor, Dr. C. H. Goodykoontz.

The claimant was again seen by Dr. James E. McGee on February 22, 1966, at the request of Dr. Goodykoontz, because of a feeling of undue bladder pres-

sure and also difficulty with an increasing and progressive type of arthritis. After examination the doctor diagnosed the claimant's condition as recurrent pelvic inflammatory disease and osteoarthritis for which medication was prescribed. On March 1, 1966, the claimant was reported as having less pelvic symptoms and abdominal and pelvic examinations were essentially negative, except for some continued vaginitis.

On August 17, 1966, the claimant was examined by Dr. James R. Shanklin, an M.D. with a subspecialty in cardiovascular disease. The report recites that the claimant has suffered "female troubles" for years, but that at the time she is doing well except for nerves and arthritis. The main arthritic symptoms are in the low back and in the hands. The backache is located in the lumbar area and is said to be relieved by rest. X-rays of the lumbosacral spine were reported to be normal. The arthritic condition in the hands is located in the fingers which are often stiff and sore and according to the claimant often become red and inflammed. The distal interphalangeal joints of her hands are abnormal with nodular deformity of the Heberden type although the report states that there is no loss of function and that mobility of all joints is good. X-rays of one hand were reported as follows: "Advanced degenerative changes are present about the distal joints of the right index, middle, and ring fingers, and expecially in the middle one where there may be old traumatic arthritis." The doctor interpreted the claimant's hand condition as osteoarthritic nodules involving the distal joints of the finger, with no major joint involvement. The doctor did not consider the condition disabling. Some emotional instability was noted, as was definite hypertension. The remainder of the report is essentially normal. The doctor concluded by stating that psychiatric help may be advisable and that the claimant should have medical management of her hypertensive state.

A psychiatric evaluation was performed on October 12, 1966, by Dr. David Wayne in the Bluefield Mental Health Center. The evaluation states that the patient showed mild anxiety and symptoms of depression which are considered treatable. The diagnostic impression was anxiety reaction, mild, with depression.

A psychological evaluation was performed on November 4, 1966, by Dr. Constantine G. Demopoulos in the Bluefield Mental Health Center. The diagnostic impression was mental deficiency, mild, chronic, with a good prognosis. It was felt that the claimant could appreciably benefit from out-patient psychotherapy treatment and that she would also benefit from supportive medication. It was noted that the claimant did express extremely poor stress tolerance for any type of employment and that she associated all her symptomatology with her physical condition. It was suggested that the claimant, before being considered disabled, should be evaluated by Vocational Rehabilitation because it was felt that she should be able to function very well in part-time or full-time employment.

Dr. J. A. Robinson examined the claimant on March 14, 1967. He had previously treated the claimant in 1954 for acute salpingitis (Uterine tube inflammation) and in 1958 for sinusitis. In the more recent examination the claimant complained of pains in the lower back, fingers, knees, feet and toes and a moderate degree of dyspnea. The report noted that the distal finger joints were considerably enlarged. The diagnosis was hypertensive cardiovascular disease and arthritis.

Dr. C. H. Goodykoontz examined the claimant on May 11, 1967. After reciting the claimant's medical history which included the swelling and pain in the joints of the fingers for several years, the lower back pain, the nervousness that had progressed to a point which prevented the claimant from working for the past three years and the chronic

bladder infection and narrowing of the urethra which had required treatment for several years, the diagnosis was (1) Osteoarthritis, generalized (2) Hypertension, moderate and (3) Anxiety reaction, severe.

There is also included in the record a medical report by Dr. H. P. Brittain. The report is undated but the papers accompanying the report are dated in June, 1967, which is probably indicative of the time when the examination was performed. The history of the claimant's present illness states that in 1964, the claimant quit working because of her nerves and at that time the claimant was having two or three episodes a week of what the claimant called "passing out". These episodes were characterized by a shortness of breath, a numbness in the left arm and a feeling of things getting black. She would fall to the ground and was able to hear although she was unable to speak. These episodes, which the claimant said lasted five minutes, occurred less frequently since the claimant quit work and since she has been taking medication. The remainder of the history recites the pain and stiffness in the distal joints of her fingers, the "female troubles" and the hypertensive state. Dr. Brittain performed a review of the claimant's symptoms. It was again noted that there were large Heberden type deformities of all the distal interphalangeal joints. The report states that the distal joints in the fingers are limited to a very small amount of motion. There is no other limitation of motion. The report was summarized:

Summary: This forty-six year old white female has changes on x-ray and physical examination of degenerative arthritis (Osteoarthritis), her only limitation of motion is in the distal interphalangeal joints of both hands. Her uric acid is normal, but in the past has been elevated. She has no complaints of cardiac trouble except dyspnea climbing stairs, and was able to do this satisfactorily under supervision. She is hypertensive.

It is indeed difficult to evaluate the amount of pain that this patient has, and it is on this point that her ability to work rests. She certainly does not have deformity or limitation of motion that would keep her from any type of work, but the pain of Degenerative Arthritis can be quite severe.

I believe it would be worthwhile to try this patient on gout therapy and/or indomethiocin to see if her pain would improve. She certainly needs to have her blood pressure controlled.

Impression:

(1) Essential Hypertension Benign

(2) Osteoarthritis

(3) Anxiety reaction; moderate with hyperventilation syndrome

(4) No evidence of Cardiac Decompensation or of Coronary insufficiency.

The claimant was admitted to St. Luke's Hospital, Bluefield, West Virginia on February 6, 1968, because of rectal pain and lower abdominal pains. Diarrhea accompanied this episode, but no bleeding occurred. A barium enema was essentially normal. The claimant was placed on drugs, improved and was discharged on February 13, 1968. The diagnosis was colitis, nonspecific.

There are also included in the record reports of the claimant's earnings and of disability interviews with the claimant.

The remainder of the record is composed of testimony adduced at the two hearings. After testifying to the nature of her work before quitting, the claimant testified at some length upon her own capabilities and the pain which she experienced. The claimant testified: that the muscles in her hands and her nerves made her quit work; that she passed out several times at work; that she was on sick leave a considerable amount of the time; that her back hurts continuously and she has difficulty bending or squatting; that her hands are so sore she can barely use them; that an infection made her sore at the bottom of her stomach, hurt her back and affected her ability to walk; that

mopping is difficult because of the pain; that "my nerves got so bad I just couldn't [work]"; that she washes the dishes, cooks, and prepares meals, but that she cannot sew, except some on a machine; that she gets stiff and can hardly walk after sitting for a short while; that standing hurts her back; that sitting bothers her; that she had spells of diarrhea; that exercise made her sore; that she suffers from shortness of breath when climbing stairs and walking; that her hands become red, inflammed and sore; that stooping hurt her back; that she cannot lift anything heavy; that she takes medicine for high blood pressure; that she has pains in her legs; that she experiences difficulty in bending the joints of her fingers; that housework is difficult; that noises upset her. The claimant was corroborated in a general way by her mother and a neighbor. Other witnesses who would have corroborated the claimant's testimony were present but did not testify.

A vocational expert testified at the second hearing. Basing the questions on sets of assumptions where the impairments were mild, moderate and severe, the hearing examiner questioned the expert as to claimant's ability to engage in substantial gainful activities, including returning to her former employment. The expert cited several examples of jobs, such as a garment factory inspector; garment cleaner, cake finisher, button machine operator, mattress maker and bench work in an electronic or electric assembly plants, which are of a light or sedentary nature, which were located locally. The expert opined that the claimant should be able to perform these jobs with mild or moderate impairments. With increased severity the claimant's impairments would affect her ability to work, but not materially. Giving all credibility to the claimant's own recital of symptoms and reactions, the expert stated that the claimant would be unemployable.

 The claimant has the burden of proving that she was under a disability as defined by the Act, 42 U.S.C.A. § 416(i), Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962), and the Secretary does not have the burden of making an initial showing of non-disability. King v. Gardner, 370 F.2d 652 (6th Cir. 1967). To be disabled within the meaning of the Social Security Act the claimant must show an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C.A. § 416(i) (1) (A). Since the claimant met the earnings requirement through March 31, 1969, the decision of the Secretary is limited to the date that it became final, August 14, 1968.

 There are four elements of proof to be considered in determining whether a claimant is able to engage in any substantial gainful activity. These are: (1) the objective medical facts as reported in the clinical findings of the treating or examining physicians, divorced from their expert opinions or judgment as to the significance of these findings; (2) the medical diagnosis and opinions of the treating and examining physicians on subsidiary questions of fact; (3) the subjective evidence of pain and disability testified to by the claimant and corroborated by witnesses presented on the behalf of the claimant and (4) the claimant's educational background, work history and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967); Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). "For the purpose of making a finding of fact on this issue, the fact finder must recognize the obvious interrelation of these elements of proof." *Underwood,* supra at 851. The record before this court bears no evidence that the fact finder recognized this interrelation or that he considered it in reaching his decision. The decision of the hearing examiner, rendered after the first hearing, contains, among others, two parts entitled "Evaluation" and "Findings". The

"evaluation" is little more than a recita-tion of the evidence presented in the record. While noting that the issue of pain was relevant, the hearing examiner merely denotes those incidents in the record where pain has been mentioned. After merely reciting the evidence of record, the following "findings" were made:

1. Claimant was born on December 21, 1920, met the special earnings requirements of the Act as of the alleged onset date, and continues to meet such special earnings requirements through March 31, 1969.

2. During the period of alleged disability, the claimant was not disabled within the meaning of the Act and Regulations either under the pre-1965 or the amended 1965 definitions of disability.

The hearing examiner has reached and determined the ultimate issue of disability after merely reciting the evidence of record in an orderly manner, and without giving the slightest clue as to how he arrived at his decision. It is unknown what weight, if any, that he assigned to the various elements such as the objective medical records, the diagnosis, the opinion, the testimony, etc. Upon appeal, the Appeals Council remanded because "the record in this case does not contain sufficient information for a decision. * * *" The instructions, upon remand, were to receive additional evidence, including that of a vocational expert to determine "the types of work activity, if any, for which the claimant is qualified on the basis of his [sic] education, training, and occupational experience. * * *" The hearing examiner, after receiving additional evidence, was "to propose findings of fact and conclusions of law, as well as reasons in support thereof."

At the second hearing additional evidence was introduced into the record, including the testimony of a vocational expert. As in the first decision, the second decision contains an "Evaluation of Evidence" and again the "evaluation" is a mere recitation, the paragraph taken from the "evaluation" and immediately preceding the "findings" reads:

The record evidence is now considered as showing that, commencing April 23, 1964, and through the period here considered, the claimant had a number of minor impairments or conditions. These consisted of: right shoulder muscle inflammation and tenderness; mild hypertension not receiving regular treatment; discomfort about the lower back, legs, feet, and toes; recurrent bladder infection; osteoarthritic changes notably in finger joints not seriously affecting their function outside of minor motion loss; and poor work stress tolerance but without psychosis. *While forming an imposing sounding list, in the opinion of the vocational expert they did not combine to render claimant incapable of continuing in substantial gainful work.* (Emphasis added)

Immediately following the above paragraph the hearing examiner makes the following findings:

1. Claimant was born on December 21, 1920, and meets the special earnings requirements of the Act at least through March 31, 1969.

2. During the period of alleged disability, commencing April 23, 1964, to the date of this decision, the claimant was not disabled within the meaning of the Act and Regulations either under the pre-1965 or the 1965 amended definition of disability.

3. During the alleged period of disability claimant had residual work capabilities so that she could have engaged in substantial work as a garment factory inspector or garment cleaner in garment factories utilizing sewing machines, cake finisher in bakeries, button machine operator or mattress maker in mattress factory, and bench assembly work in

electronics or electric assembly plant.

■ Again, after simply reciting the evidence of record, the hearing examiner has decided the ultimate issue of disability without weighing the different elements involved, or if such was done then without disclosing as a matter of record that the evidence was weighed and interrelated to reach a proper result. It is not within the province of the reviewing court to weigh evidence or to substitute our judgment for that of the Secretary if his decision is supported by substantial evidence. Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). This presupposes that the evidence has been weighed by the administrative officials and that a reasonable conclusion supported by substantial evidence has been reached. It has been held that substantial evidence is that which a reasoning mind would accept as sufficient to support a particular conclusion. It is more than a scintilla of evidence, but less than a preponderance. Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966); Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). Substantial evidence is not merely a recitation of a mass amount of evidence presented as a matter of record. It is evidence that will, *when properly weighed,* be accepted by a reasoning mind as sufficient to support a particular conclusion. Meaningful judicial review is possible only where the record indicates that the evidence of record has been properly weighed and that it has either been accepted or rejected in whole or in part. Judicial review does not entail speculation as to conclusions reached by the fact-finder. This is not to mean that an exact measuring of the evidence is required, but rather that a weighing of the evidence, with a consideration of all the material elements, should be apparent to the court upon review. This, we believe, will preserve the roles of fact-finder to the administrative agency and that of review to the court.

Thus, we remand the case to the Secretary for specific findings of fact to support his ultimate conclusions or for any further proceedings not inconsistent with this opinion that may be deemed necessary.