**Arnold E. DEYO, Jr.,**
**Plaintiff,**

v.

**Caspar WEINBERGER, Secretary of**
**Health, Education and Welfare,**
**Defendant.**

**No. 73 Civil 1993.**

United States District Court,
S. D. New York.

Dec. 15, 1975.

Mark D. Fox, Goshen, for plaintiff.

Paul· J. Curran, U. S. Atty., New York City, for the United States; Christopher Roosevelt, Walter S. Mack, Jr., Asst. U. S. Attys., Borge Varmer, Regional Atty. II, Diana M. Weiner, Asst. Regional Atty., Office of the General Counsel, Dept. of H. E. W., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

■ Plaintiff commenced this action pursuant to section 205(g) of the Social Security Act[1] for judicial review of a final decision of the Secretary of Health, Education and Welfare (hereafter "Secretary") denying plaintiff's application for disability insurance benefits.[2] The parties have made cross-motions for summary judgment. The sole issue is whether the Secretary's determination that plaintiff was not "disabled" within the meaning of the Act[3] is supported by substantial evidence based upon a consideration of the record as a whole.[4] After a word-by-word reading and "searching investigation"[5] of the entire record and a close analysis of the report of the Magistrate to whom the matter was referred[6] and who recommended reversal of the Secretary's determination, the court is persuaded that the Secretary's determination must be upheld.

■ The plaintiff, Arnold Deyo, is 59 years of age and of limited education. Until 1968 he was self-employed as a junk dealer, but, he claims, he then became unable to continue in business because of his ill health. Specifically he alleges a disability arising out of a progressively worsening knee condition and an arthritic condition affecting his lower back. He receives total disability payments from the Veterans Administration,[7] and has been hospitalized twelve times in a VA hospital since he first applied for Social Security disability benefits in 1964.[8]

Plaintiff's claim has received extensive consideration by the administrative agency. In August 1971 a hearing examiner affirmed a prior determination that he was not entitled to disability benefits under the Act.[9] Upon review,

---

1. 42 U.S.C. § 405(g).

2. *See* 42 U.S.C. § 423.

3. The Act defines "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuance period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1).

4. 42 U.S.C. § 405(g). *See also Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975); *Gold v. Secretary of Health, Educ. & Welfare*, 463 F.2d 38, 41 (2d Cir. 1972); *Pucci v. Richardson*, 369 F.Supp. 1344, 1346 (S.D.N.Y.1973).

5. *Cf. Gold v. Secretary of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972).

6. The reference was pursuant to a suggestion made by the Director of the Administrative Office, under authorization by the Judicial Conference, "in order to encourage an expanded use of United States Magistrates." Memorandum to all Federal Judges and United States Magistrates, March 14, 1975. *See Weber v. Secretary of Health, Educ. &*

*Welfare*, 503 F.2d 1049 (9th Cir. 1974), cert. granted sub nom. *Weinberger v. Weber*, 420 U.S. 989, 95 S.Ct. 1422, 43 L.Ed.2d 669 (1975). *But see Ingram v. Richardson*, 471 F.2d 1268 (6th Cir. 1972).

7. Disability with reference to the receipt of veterans' benefits, while relevant, does not control the issue of eligibility for Social Security benefits. *Hess v. Secretary of Health, Educ. & Welfare*, 497 F.2d 837, 841 n.5 (3d Cir. 1974); *Zimbalist v. Richardson*, 334 F.Supp. 1350, 1355 (E.D.N.Y.1971). *Cf. Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975); *Robinson v. Richardson*, 360 F.Supp. 243, 249 (E.D.N.Y.1973).

8. The plaintiff filed a second application in 1969, *see* note 9 *infra*, and it is the 1969 application which is now before the court.

9. Plaintiff first attempted to secure disability benefits in 1964, complaining at that time of a "bad back" and a "bad left leg." He requested a reconsideration following an initial adverse determination, and his claim was again rejected in April 1965. Plaintiff did not request a hearing following the 1965 decision, but made a new application for disability benefits in May of 1969, complaining

the Appeals Council held, contrary to the hearing examiner's finding, that plaintiff may be precluded from his usual heavy work activity and remanded the case to obtain additional evidence and the testimony of a vocational expert as to the type and existence of work activity, if any, for which the plaintiff is qualified. Upon remand, and before another hearing examiner, additional testimony was received from plaintiff, as well as from a vocational expert. The hearing examiner, among other findings, found that in view of plaintiff's age he could not have engaged in substantial gainful activity in his prior work as an auto wrecker and junkyard worker. However, the hearing examiner further found that plaintiff had transferable skills and that the evidence was insufficient to establish that plaintiff's left knee or other impairment rendered him unable to engage in substantial gainful work, commensurate with his age, education and work experience, which exists in the national economy. The prime issue here centers about that finding.

The hearing examiner, upon a detailed analysis of the extensive Veterans Administration hospital records and medical reports, found that the only impairment severe enough to affect plaintiff's ability to work was the left knee impairment, and that because of the knee's aching and swelling its use for prolonged periods was limited. Apart from that impairment, plaintiff has suffered recurrent hemorrhoids, colitis, gastritis, a respiratory infection and various other transient conditions, some of which were accompanied by an anxiety neurosis. The Social Security Act, however, conditions its benefits not upon general ill health, but upon the existence of a "physical or mental impairment" [10] which must be "of such severity that [the claimant] is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." [11] Viewed against the applicable law, the record abundantly supports the Secretary's determination. Because of the importance of the objective medical evidence, it is reviewed at some length.

On March 12, 1964, plaintiff entered the VA hospital at Castle Point, New York, complaining of persistent low back pain preventing him from doing heavy lifting. X-rays were taken, revealing slight arthritic changes in the left knee and a spondylitis of the lower spine with small anterior osteophytes. Plaintiff was diagnosed as suffering from a sacroiliac sprain, which improved with treatment, and an internal derangement of the left knee resulting from service-related injuries suffered during World War II, which was left untreated. These diagnoses were reaffirmed after an examination of plaintiff conducted on April 10, 1964, on behalf of the New York State Department of Social Welfare. Plaintiff was at that time certified as "able to do light manual work."

Plaintiff was next examined by Dr. Penelope Sherwood, an orthopedic specialist, in September 1964, following his initial application for Social Security disability benefits. Although Dr. Sherwood found degenerative arthritis of the spine and post-traumatic arthritis of the left knee, she noted that the range of motion of plaintiff's spine was not limited, and she found no restriction on plaintiff's ability to walk, stand, bend, or lift. X-rays taken at that time again verified plaintiff's left knee injury, but failed

then of a "spinal problem," arthritis, and a gastric ulcer. The claim was denied by the Bureau of Disability Insurance on September 3, 1969 and, following a request for reconsideration, was again denied on March 27, 1970.

10. 42 U.S.C. § 423(d)(1).

11. 42 U.S.C. § 423(d)(2)(A).

to reveal "any significant bone or joint changes" in the lumbar spine.

In May and June of 1966 plaintiff was again hospitalized for low back pain. Although he complained of pain that was at times quite severe, the hospital records state that the physical examination "was essentially negative." X-rays of the lumbar spine were consistent with those taken earlier and revealed only "[v]ery slight productive changes." Plaintiff received physiotherapy and responded with marked improvement. He was readmitted on September 13, 1967, complaining of pain in both knees, and a diagnosis of osteoarthritis of the lumbar spine and of both knee joints was entered. The examining physician also noted that plaintiff had formed an anxiety reaction in response to his condition, and prescribed tranquilizers and muscle relaxers. Plaintiff's symptomology improved, and he was discharged on September 25th.

In February 1968 plaintiff was hospitalized and treated for a rectal polyp after complaining of epigastric pain. Osteoarthritic symptoms were again noted but not treated. Plaintiff returned to the hospital on February 29, 1968, one day after his previous discharge, complaining of epigastric pain, weakness and diarrhea. Although an upper respiratory infection was diagnosed and treated, the hospital record noted that plaintiff's physical examination was "unremarkable." He was referred to a psychiatrist, who thought plaintiff to represent "a case of psychoneurosis, anxiety state with some depression." Plaintiff was reassured and it was noted that "[h]e felt less nervous on discharge."

Following plaintiff's second application for disability benefits (the application before the court in this case) he was seen by a general practitioner, Dr. S. Schleiermacher, on May 24, 1969. Dr. Schleiermacher diagnosed plaintiff as suffering from arthritis of the spine, with curvature, and muscle spasms in the arms and legs. There was no indica-

tion that Dr. Schleiermacher performed any special studies or that he ordered x-rays or laboratory reports, and in a letter to the Social Security Administration the doctor stated that "[i]n my opinion, [plaintiff] should be examined by your doctor in Middletown." At the request of the Secretary, plaintiff was then examined on August 15, 1969, by Dr. M. Altchek, a specialist in orthopedic surgery and a member of the American Board of Orthopaedic Surgery and the American Academy of Orthopaedic Surgeons. Dr. Altchek found that plaintiff could move his back through a full range of motion without spasm and that he could toe and heel walk well, although he could not do so without complaining of pain. Plaintiff's muscles were found to be "in excellent shape," and straight leg raising tests were completely negative both sitting and lying. Plaintiff could operate all the joints of his arms and legs through a full range of motion, and there was no evidence of swelling or deformation in any joints other than the left knee. Dr. Altchek concluded that "[d]espite [plaintiff's] complaints, there is no evidence of any arthritis in the fingers, the toes, the joints of the feet, or the ankles." X-rays revealed no significant changes from five years earlier—they showed "some mild osteoarthritic lipping throughout," but the doctor concluded that the amount was "about average" for plaintiff's stated age, and "possibly a little less." Although evidence of osteoarthritic changes in the left knee was found, there was no evidence of other arthritic changes "of any significance." Dr. Altchek concluded: "In any event, I believe the left knee would cause some aching on hard use and might swell up now and then. In my opinion the patient should be able to perform activities of weightbearing, walking, bending, stooping, standing, lifting, and grasping within normal limits for a man of his age group except that he might have some aching and swelling in the left knee after prolonged periods of use. It is not sufficient to prevent him from doing any of these

activities to a normal extent. . . . Outside of this left knee, I cannot find any evidence of organic impairment beyond that of an average male of his stated age of 53."

Plaintiff returned to Castle Point on January 22, 1970. He was operated upon for a hemorrhoid condition, and an anxiety reaction was again noted. But for the hemorrhoids, a physical examination was "essentially negative." He was readmitted on April 14, 1970, with a chief complaint of "frequent bowel movement." He was placed on a diet and tranquilizers and discharged. He returned to the hospital on September 16, 1970, with a history of loose stools, general weakness, and "a questionable cold." Doctors diagnosed him as suffering from colitis, gastritis, sinusitis, and nervousness, and placed him on Librium, a tranquilizer. He was admitted for the fourth time that year on October 13, 1970, when he was operated upon for recurrent hemorrhoids and discharged with advice to return to the clinic for follow-up treatment. Records indicate that plaintiff was seen at the clinic on December 29, 1970, and January 4, 1971, complaining both times of pain in his left knee. He was referred to the orthopedic clinic and was rehospitalized on January 11, 1971. X-rays taken on January 5 revealed that the "[s]acral spine showed no bone changes and the sacral iliac joints appeared to be clear." Although there were some indications of an "early degenerative disk lesion at the lumbosacral joint" of the spine, as well as certain irregularities within the right knee, diagnoses were confined to gastritis, anxiety neurosis, and residual trauma of the left knee. Surgery was performed on the left knee on March 19, 1971 and the VA records recite that plaintiff's postoperative course was "smooth and uneventful." He was discharged on May 27, 1971. His report

states: "Even though the patient objectively improved markedly after the knee operation he kept complaining of pain in the knee on and off and this was a different kind of new pain and therefore the patient was kept for further evaluation. The following examinations did not reveal any abnormal findings and . . . therefore the patient was discharged in good condition . . . ."

The final entry in the record concerns plaintiff's admission to Castle Point on February 28, 1972, again complaining of pain in his left knee.[12] New x-rays of both the knee and the lumbosacral spine were taken. Significantly, the spinal x-ray showed no change from those taken in 1969, revealing only "some lipping of the articular margins characteristic of mild osteoarthritis." While malformations of the left knee were found, and further surgery recommended, plaintiff contracted a cold and later refused another operation.

The picture that emerges from this rather lengthy recapitulation of the medical evidence is one of a man plagued by (1) a variety of transient, though distressful, conditions (e. g., hemorrhoids, gastritis, diarrhea), none of which can conceivably give rise to a claim of disability of a twelve-month duration, (2) a mild osteoarthritic condition of the spine, which has not changed appreciably since 1969, at which time the weight of the evidence indicated that there were no medical reasons why plaintiff should not have been able to perform the normal activities of weight-bearing, walking, bending, stooping, standing, lifting, and grasping, and (3) a serious and often painful problem with respect to plaintiff's left knee.

Clearly, if a judgment were to be made solely with respect to the medical record, the Secretary's decision may not be overturned for lack of substantial evidence.

12. Although plaintiff met the special earnings requirement for disability payments only through December 31, 1971, evidence of treatment after that date may be considered insofar as it bears on the claimant's previous condition. *Gold v. Secretary of Health, Educ. & Welfare*, 463 F.2d 38, 42 (2d Cir. 1972) ; *Carnevale v. Gardner*, 393 F.2d 889, 890 (2d Cir. 1968).

Despite plaintiff's many complaints and recurrent visits to the VA hospital at Castle Point, doctors there were unable to discover physiological bases for plaintiff's back pains. The only colorable claim of disability emerging from the objective medical evidence is based upon the condition of plaintiff's left knee. As already noted, the hearing officer, based upon Dr. Altchek's report, did find that the left knee impairment precluded plaintiff from engaging in his former heavy work. Dr. Altchek, however, concluded that plaintiff could perform physical activities normal for a man of his age, except that he might have some aching and swelling in the left knee after prolonged periods of use. There is uncontradicted and credible testimony by the qualified vocational expert that, even assuming plaintiff's left knee would ache and swell upon use, he could perform certain types of factory jobs, such as bench assembly work, and that hundreds of such jobs were available in plaintiff's immediate area. While this testimony was given upon the express assumption that there were no limitations as far as plaintiff's ability to sit and to use his hands, the medical record contains sufficient evidence to support such an assumption.

■ Of course, the Secretary's determination must be based upon more than a simple weighing of objective medical evidence. As the Second Circuit recently noted, "[a] physical or mental impairment 'does not cease to exist merely because it is difficult of proof.' "[13] Thus plaintiff's subjective complaints of pain and descriptions of symptomology, even if unsupported by "objective" clinical or laboratory findings, must be considered and evaluated by the hearing examiner.[14] Here plaintiff testified that his back gives him considerable pain when he either sits or stands for any duration; that his hands hurt even if he reads a newspaper and peels three or four potatoes; that the pain in his back prevents him from sleeping at night; that he cannot go up or down stairs without pain; and that he feels considerable pain when he bends to lift any object of appreciable weight. There can be no doubt that plaintiff would be fully disabled were his claims accepted at face value, as the vocational expert testified during the second hearing on plaintiff's application. However, the requirement that a claimant's descriptions of symptoms and pain be considered does not mean that such statements must be accepted without question.[15] The Regulations under the Social Security Act specifically provide that "[s]tatements of the applicant, including his own description of his impairment (symptoms) are, alone, insufficient to establish the presence of a physical or mental impairment." [16]

In the instant case, even apart from the lack of significant medical opinion supporting plaintiff's complaints, the record contains substantial evidence to support the determination that plaintiff's testimony was not reliable. As noted by the hearing examiner who considered plaintiff's application upon remand from the Appeals Council, "the claimant's activities of driving [his] wrecker to the junk yard after he allegedly became disabled, maintaining a garden, buying and driving a pick-up truck, going fishing, going grocery shopping, and attending bingo, appear inconsistent with the varied symptoms stated by him." In

13. *Cutler v. Weinberger*, 516 F.2d 1282, 1287 (2d Cir. 1975), *quoting Celebrezze v. Warren*, 339 F.2d 833, 838 (10th Cir. 1964).

14. *Cf. Cutler v. Weinberger*, 516 F.2d 1282, 1286–87 (2d Cir. 1975) ; *Robinson v. Richardson*, 360 F.Supp. 243, 248 (E.D.N.Y.1973) ; *Taylor v. Gardner*, 297 F.Supp. 743, 746 (N.D.Ill.1969).

15. *Cf. Longo v. Weinberger*, 369 F.Supp. 250, 256–57 (E.D.Pa.1974) ; *Farmer v. Weinberger*, 368 F.Supp. 1, 6–7 (E.D.Pa.1973) ; *Cunningham v. Richardson*, 360 F.Supp. 1037, 1042 (E.D.Pa.1973) ; *Lucas v. Richardson*, 348 F.Supp. 1156, 1162 (D.Kan.1972) ; *Ketron v. Finch*, 340 F.Supp. 845, 850–51 (W.D. Va.1972).

16. 20 C.F.R. § 404.1501(c) (1974).

addition, the transcript of the administrative hearings contains instances of answers that, at least upon the cold record, appear evasive.[17] The hearing examiner, based upon a consideration of plaintiff's demeanor and the entire testimony and record, accepted his testimony that he experienced swelling and pain by reason of his left knee impairment, but "did not credit [plaintiff's] testimony about his symptoms to the extent that such shows physical limitations except proscription of prolonged use of his left knee." The credibility of witnesses is a matter within the sole province of the hearing examiner to determine, and where, as here, there is evidence to support the examiner's determination, it would be improper for a reviewing court to parse the cold record in search of a different result.[18]

The entire record leaves no room to doubt that the hearing examiner who presided over the second hearing of plaintiff's claim fulfilled his duty " 'scrupulously and conscientiously [to] probe into, inquire of, and explore for all the relevant facts . . . .' "[19] The court concludes that the Secretary's decision must stand.

Settle order on notice.

---

17. *See, e. g.,* Tr. at 66.

18. *Kirby v. Gardner,* 369 F.2d 302, 304 (10th Cir. 1966) ; *Longo v. Weinberger,* 369 F. Supp. 250, 256 (E.D.Pa.1974) ; *Urgolites v. Finch,* 316 F.Supp. 1168, 1173 (W.D. Pa.1970). *Cf. Hemphill v. Weinberger,* 483 F.2d 1137, 1139 (5th Cir. 1973) ; *Reyes Robles v. Finch,* 409 F.2d 84, 86–87 (1st Cir. 1969) ; *Mitchell v. Gardner,* 123 U.S.App. D.C. 195, 358 F.2d 826, 828 (1966) ; *Celebrezze v. Bolas,* 316 F.2d 498, 501 (8th Cir. 1963) ; *Mullen v. Gardner,* 256 F.Supp. 588, 590–91 (E.D.N.Y.1966).

19. *Cutler v. Weinberger,* 516 F.2d 1282, 1286 (2d Cir. 1975), *quoting Gold v. Secretary of Health, Educ. & Welfare,* 463 F.2d 38, 43 (2d Cir. 1972), *quoting Henning v. Gardner,* 276 F.Supp. 622, 624 (N.D.Tex.1967).